**Alfred D. WARRICK, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 85–869.**

District of Columbia Court of Appeals.

Argued March 19, 1987.
Decided July 6, 1987.

---

Richard S. Stolker, Rockville, Md., appointed by the court, for appellant.

Susan A. Nellor, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell and Helen M. Bollwerk, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before NEWMAN, FERREN and ROGERS, Associate Judges.

NEWMAN, Associate Judge:

In *Garris v. United States*, 491 A.2d 511 (D.C.1985), we "suggested" the appropriate procedure for the trial court to follow where a defendant has been convicted of two offenses, only one of which can be sustained because of double jeopardy considerations. This case points out the problems presented when a trial judge fails to heed those "suggestions".

■ Warrick was charged with two counts of first-degree burglary while armed for one entry into the home of William Malone. One count alleged that the burglary was committed with intent to steal, the other that it was committed with intent to assault. The jury returned a verdict of guilty on both counts of burglary. These counts cannot both be sustained on appeal. *Stewart v. United States*, 490 A.2d 619, 626 (D.C.1985) (convictions for burglary with intent to steal and burglary with intent to commit assault merge since societal interest served by burglary statute was offended only once); *Thorne v. United States*, 471 A.2d 247, 248 (D.C.1983) (same; burglary with intent to destroy property and burglary with intent to assault).

In *Garris, supra,* in order to avoid the trial court's having to guess in such situations, which count, if not both, was free of legal defect, we "suggested" that the trial court delay its election as to which count to vacate until after appeal. We predicted a likely consequence of a failure to heed that "suggestion". That prediction comes true in this case. For here, Warrick challenges the sufficiency of the evidence to sustain his conviction of burglary while armed with

intent to assault. We agree with him that the evidence is insufficient and reverse. We reject the government's invitation to consider the validity of the jury verdict of guilty of burglary while armed with intent to steal where no judgment has been entered on that count. We remand to the trial court with instructions to enter judgment on the jury verdict of guilty of first-degree burglary while armed with intent to steal. Warrick may then file a notice of appeal from that judgment.[1]

Warrick also challenges a summary adjudication of criminal contempt in the trial court. We reverse this conviction as well.

## I

The government's evidence showed that on the morning of February 9, 1985, appellant Alfred Warrick entered the home of William Malone, and subsequently stabbed Malone in the neck with a kitchen knife. According to Malone's testimony, he lived at that time in Southeast Washington, D.C. with his wife, Laura Fowler, his stepson, Lucius Fowler, and Lucius' wife, Marion Fowler. His son, Billy Malone, was visiting for the weekend. At about 5:45 a.m. on the morning in question, he left his home to go to the store. His wife was at work; the other members of the household were still upstairs in their bedrooms. He returned home at about 6:30 a.m., unlocked his front door, and entered the house. While he was in the kitchen, an unknown person approached him from an adjoining hallway, said, "Stick up" and stabbed him in the neck with a kitchen knife.

Malone grabbed the intruder's wrist, and the two struggled into the living room, where he was able to knock the knife from the intruder's hand. He called upstairs to his son, Billy, and his stepson, Lucius Fowler. These two came down along with Lucius' wife, Marion. Lucius joined in the struggle while Billy and Marion watched from the stairway. During the struggle, Lucius picked the knife up off the floor and stabbed the intruder twice. The struggle continued, the three men working their way out the front door onto the outside steps. Malone tried to pull the intruder back into the house, but Lucius shouted to him to let the man go. The latter escaped and fled. Malone gave chase unsuccessfully. Afterward, his son Billy called the police, and he was taken to the hospital where he was treated for his neck wounds. Malone testified that during the struggle, the intruder kept repeating, "Sharon let me in." Malone knew nobody by the name of Sharon.

Lucius Fowler's testimony essentially corroborated that of William Malone as to the events occurring after Malone called for his sons. After the intruder had fled, Fowler disposed of the knife with which he had stabbed the intruder (and with which the intruder had earlier stabbed Malone) by throwing it into a dumpster.[2] He testified

---

1. Warrick also claims that the trial court committed reversible error by admitting identification evidence of a lineup at which he had made a statement revealing his knowledge of the crime, causing the lineup to be both unduly suggestive and violative of his fifth amendment privilege against self-incrimination. This claim was not raised prior to trial as required by D.C. Code § 23–104(a)(2) (1981) and Super.Ct.Crim. 12(b)(3); it is alleged for the first time on appeal accompanied by no showing of good cause for failure to raise it earlier. We therefore consider the contention waived on appeal. *Streater v. United States,* 478 A.2d 1055, 1058 (D.C.1984).

We observe, however, that suppression of identification testimony is a sanction against police misconduct in violation of due process of law or the accused's right to counsel. *Brown v. United States,* 349 A.2d 467, 468 (D.C.1975), citing *United States v. Wade,* 388 U.S. 218, 87 S.Ct.

1926, 18 L.Ed.2d 1149 (1967), and *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). The record shows no police misconduct here. To the extent Warrick drew attention to himself by making a remark showing his knowledge of the crime, he did so voluntarily, not as a result of compulsion by the police. Likewise, "the Fifth Amendment is limited to prohibiting the use of 'physical or moral compulsion' exerted on the person asserting the privilege." *Fisher v. United States,* 425 U.S. 391, 397, 96 S.Ct. 1569, 1574, 48 L.Ed.2d 39 (1976). There was no such compulsion here.

Warrick was also convicted of assault with intent to kill while armed. He does not assail this conviction.

2. Fowler testified that he threw the knife away because he had a felony indictment against him, and was afraid of the consequences of his having stabbed the intruder. The knife was not recovered by the police.

that he did not recognize the kitchen knife as one belonging to the Malone home.

Fowler further testified that after the excitement was over, he noticed that one of the household's T.V.'s was sitting in a carrying bag on the living room floor. When he had gone to bed the night before, the T.V. had been in its usual place on a table in the living room. The carrying bag was one in which Billy Malone had brought his clothes when he came to visit for the weekend. Billy's clothes were now lying on a kitchen counter.

Billy Malone testified that the previous night when he went to bed, his carrying bag containing his clothes was lying on the floor by the front door. In the morning, he came downstairs upon hearing his father's call. His testimony as to the ensuing events corroborated that of Lucius Fowler and his father. Like Fowler, Billy Malone testified that the kitchen knife did not look like the ones in the Malone home.

Detective Langery Tucker, who had come to the Malone home in response to a radio call concerning the stabbing, testified that an inspection revealed no signs of forced entry. However, the front door was of the type that locks automatically upon closing. This particular door was such that if it was not pulled tightly closed or slammed, it would appear closed but would not lock, and could be pushed open from the outside.

Appellant Warrick presented a defense of self-defense. He testified that on February 8, 1985 (the day before the above events took place), he met an attractive woman, known to him only as Sharon. The two struck up a conversation, after which she gave him a ride home. Around midnight that evening, Sharon telephoned him to ask if he wanted to go out. He accepted.

They went to dinner, then to a club, then drove around and talked. By that time it was 4:00 or 5:00 a.m. Sharon bought some cocaine on the street from two prostitutes. She told Warrick she needed to stop at her place to get a pipe and some other things. She drove him to what he thought was her apartment; he followed her inside. She invited him into the kitchen for something to eat, but then said that she had forgotten something, and walked out. Warrick remained in the kitchen, waiting for her.

Warrick had waited about ten minutes when he heard the sound of a key in the door, followed by footsteps. He thought it must be Sharon, but when he looked up there was a man coming around the corner into the kitchen. Without saying anything, the man attacked him. Warrick reached for a knife that was sitting on the kitchen counter, and threatened the man with it in order to ward him off. He did not intend to harm the man, and soon dropped the knife on the floor without having used it. His assailant still refused to release him. The two tussled into the living room. Two young men came down the stairs, one of whom, he later saw, held a knife in his hand. Warrick struggled free of the older man and went to the door. At some point during the scuffle, he was stabbed in the side. He asked several times where Sharon was, but to no avail. He turned and fled.

After returning home and discovering the seriousness of his injuries, Warrick called the police, who in turn called an ambulance which took him to the hospital. He denied having stabbed William Malone or threatening to kill him.

## II

We are first called upon to determine whether the evidence was sufficient to support Warrick's conviction for first degree burglary while armed with intent to commit assault. In evaluating a claim of insufficient evidence, we must view the evidence in the light most favorable to the government, mindful of the jury's right to determine credibility, weigh the evidence, and draw justifiable inferences of fact. *McClain v. United States*, 460 A.2d 562, 567 (D.C.1983). We will reverse a conviction only if there is no evidence upon which a reasonable mind could infer guilt beyond a reasonable doubt. *Head v. United States*, 451 A.2d 615, 622 (D.C.1982).

Under our burglary statute, D.C. Code § 22–1801 (1981), the government must prove beyond a reasonable doubt that the defendant entered the premises having already formed an intent to commit a crime therein.[3] " 'The requisite intent ... is a state of mind particular to the accused and unless such intent is admitted, it must be shown by circumstantial evidence.' " *Shelton v. United States*, 505 A.2d 767, 770 (D.C.1986), quoting *Massey v. United States*, 320 A.2d 296, 299 (D.C.1974). Unauthorized presence in another's premises does not alone support an inference of criminal purpose at the time of entry; but when the unauthorized presence is aided by other circumstances, such an inference may be drawn. *Shelton, supra*, 505 A.2d at 770, citing *United States v. Fox*, 140 U.S. App.D.C. 129, 131, 433 F.2d 1235, 1237 (1970). We have never attempted to narrowly define the kind of "other circumstances" which might support an inference of criminal intent, preferring to consider in each case whether the circumstances are such as "might lead reasonable people, based upon their common experience, to conclude beyond a reasonable doubt that appellant intended to commit some crime upon the premises." *Shelton, supra*, 505 A.2d at 770 (footnote omitted); *Massey, supra*, 320 A.2d at 299.

The government presented evidence showing that Warrick was armed with a dangerous weapon at the time of his entry into the Malone home,[4] that he did not know any of the members of the Malone household and they did not know him, and that once inside he placed a T.V. in a carrying bag, and later committed an assault when surprised by the appearance of William Malone. The fact that Warrick committed an assault once inside the premises does not justify an inference that he intended to do so when he entered the home. *Cf. Parker v. United States*, 449 A.2d 1076, 1077 (D.C.1982) (the sole fact that person who entered premises on legitimate business stole property once inside "very likely" would not support inference of intent to commit crime at time of entry). As to his placement of a T.V. set in a bag, although this evidence may support an inference of an intent to steal,[5] it is not indicative of an intent to commit assault.

We are left with the fact that at the time he entered the Malone home, Warrick was armed with a dangerous weapon. This evidence might support an inference that he intended to use the weapon *if* somebody attempted to interfere with his taking of property. A conviction for burglary may not rest on such an "if".

Were we to hold that intent to commit assault may be inferred from possession of a dangerous weapon, such an inference could be made in every case in which a defendant was charged with burglary while armed, substantially relieving the government of the burden of proving intent in such cases. This inference already provides the basis for our statute providing for enhanced penalties for crimes of violence committed while armed. D.C. Code § 22–3202 (1981 & 1986 Supp.). Congress chose enhancement of sentences as its method of deterring armed crimes in the District of Columbia. *See* H.R.Rep. No. 907, 91st Cong., 2d Sess. 68, *reprinted in* 1970 D.C. Code Legis. & Admin. Serv. 399,

---

3. D.C. Code § 22–1801(a) (1981) provides, in relevant part:

> Whoever shall, either in the nighttime or in the daytime, break and enter, or enter without breaking, any dwelling ... with intent to break and carry away any part thereof, or any fixture or other thing attached to or connected thereto or to commit any criminal offense, shall, if any person is in any part of such dwelling ... at the time of such breaking and entering, or entering without breaking, be guilty of burglary in the first degree.

4. We reject Warrick's contention that there was insufficient circumstantial evidence from which the jury could conclude that he was armed when he entered the Malone home. Although William Malone was unable to say what type of knife was used to stab him, Lucius Fowler and Billy Malone both testified that the weapon used was a kitchen knife which did not belong to the Malone household.

5. *See, e.g., Massey, supra*, 320 A.2d at 299 (inference of intent to steal supported by early morning forcible entry, preparation to carry away items of value, and attempt to conceal presence).

463–65 (discussing 1967 and 1970 amendments to D.C. Code § 22–3202). We do not discern in our burglary statute an additional legislative attempt to deter armed crimes by permitting conviction solely on the basis that the perpetrator was armed.

■ We find insufficient evidence to sustain Warrick's conviction for burglary while armed with intent to commit assault. On remand, the trial court shall vacate this conviction, and enter judgment on the count of first degree burglary while armed with intent to steal. *Garris, supra,* 491 A.2d at 515. Warrick may, of course, exercise his right to appeal from the substituted conviction. D.C.Code § 11–721 (b) (1981); *Garris, supra,* 491 A.2d at 515.[6]

### III

Immediately after Warrick was sentenced by the trial court, the following exchange took place:

THE COURT: ... Eighteen pages of notes. I don't need any presentence reports.

THE DEFENDANT: The day will come for your judgment.

THE COURT: He just made a contemptuous remark. So, make that another year.

[DEFENSE COUNSEL]: Could the Court by any chance reconsider that?

THE COURT: No. It is exactly what my impression was. He was a glib liar.

Warrick contends that his comment, "the day will come for your judgment," did not support a finding of contempt, and that

even if it did, a one-year sentence of imprisonment could not be imposed without a jury trial, or a waiver of jury trial.

Under D.C. Code § 11–944 (1981), a Superior Court judge "may punish for disobedience of an order or for contempt committed in the presence of the court." Such contempt may be punished summarily when necessary to preserve order in the courtroom for the proper conduct of business. *In re Gates,* 248 A.2d 671, 676 (D.C.1968); Super.Ct.Crim.R. 42(a). However, "the power to punish summarily should be exercised sparingly," *In re Schwartz,* 391 A.2d 278, 281 (D.C.1978) (citations omitted), and should be used to punish only willful attempts to show disrespect for the court or to disrupt the proceedings. *In re Gorfkle,* 444 A.2d 934, 940 (D.C.1982).

■ A party or attorney who directs an insulting or improper remark to the judge may, without question, be summarily found in contempt. *See id.* at 940 and cases cited therein. However, such a finding was not proper here. Warrick's comment was in no way disruptive of the proceedings, which, to all intents and purposes, had already ended. He did not display repeated contemptuous and disrespectful conduct in the face of warnings by the court,[7] but made one isolated comment. As it appears in the transcript, the meaning of this comment was at least ambiguous.

Had the trial court conformed with the requirements of Super.Ct.Crim.R. 42(a) by entering an order of contempt reciting the facts surrounding the contemptuous con-

---

6. We reiterate the "suggestion" which we made in *Garris, supra,* that when a jury has returned guilty verdicts on two counts which merge, the trial court need not "guess which ... conviction[] will survive on appeal" and enter an acquittal on the other count. 491 A.2d at 515.

> Initially permitting convictions on both counts serves the useful purpose of allowing this court to determine whether there is error concerning one of the counts that does not affect the other.... If so, then no merger problem even arises as only one conviction stands. If not, a remand to the trial court with instructions to vacate one conviction cures the double jeopardy problem without risk to society that an error free count was dismissed.

*Id.* at 514–15 (citations omitted). This policy will avoid situations, as occurred here, in which it becomes necessary to remand for substitution of convictions, from which the defendant may take a second appeal.

7. *See Sacher v. United States,* 343 U.S. 1, 4, 72 S.Ct. 451, 452, 96 L.Ed. 717 (1952) (judge "constantly provoked by useless bickering, exposed to offensive slights and insults, harried with interminable repetition"); *In re Nesbitt,* 345 A.2d 154 (D.C.1975) (attorney repeatedly and flagrantly defied the authority of the court); *Offutt v. United States,* 93 U.S.App.D.C. 148, 208 F.2d 842 (1953) (numerous insolent and insulting remarks and defiance of judge's orders), *rev'd on other grounds,* 348 U.S. 11, 75 S.Ct. 11, 99 L.Ed. 11 (1954).

duct,[8] it might have demonstrated, by describing Warrick's tone of voice or accompanying conduct, for example, that the comment was indeed threatening or sinister. But the court did not do so, and the record as it appears before us is devoid of evidence that Warrick's comment showed such "flagrant disrespect for the court" as to merit a conviction for criminal contempt. *See Schwartz, supra,* 391 A.2d at 282.[9]

## IV

The convictions for first degree burglary while armed with intent to commit assault, and for criminal contempt, are reversed. The case is remanded for entry of judgment on first degree burglary while armed with intent to steal, from which Warrick may appeal.

*So ordered.*

---

**8.** Super.Ct.Crim.R. 42(a) provides:

*Summary disposition.* A criminal contempt may be punished summarily if the judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the Court. The order of contempt shall recite the facts and shall be signed by the judge and entered of record.

**9.** Since we find that no contempt was committed, we need not address Warrick's contentions as to the sentence imposed.

