Jose Gilberto PORTILLO, Appellant,

v.

UNITED STATES, Appellee.

No. 11–CF–0431.

District of Columbia Court of Appeals.

Argued Sept. 25, 2012.

Decided March 21, 2013.

Jeffery O'Toole for appellant. Molly Cannon was on the brief for appellant.

Peter S. Smith, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, Roy W. McLeese III, Assistant United States Attorney at the time the brief was filed, and Michael T. Truscott and Reagan Taylor, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN, BLACKBURNE–RIGSBY, and OBERLY, Associate Judges.

BLACKBURNE–RIGSBY, Associate Judge:

Appellant, Jose Portillo, was convicted after a jury trial of two counts of first-

degree felony murder while armed.[1] Appellant contends, *inter alia,* that the trial court failed to conduct an adequate inquiry into his pretrial ineffective assistance of counsel claim as required by the *Monroe–Farrell* line of cases. We agree and remand the case so that the trial court may conduct further inquiry into appellant's pretrial ineffective assistance of counsel claim.

## I.

On November 20, 2008, appellant was drinking beer and using drugs with his friends Angela and Peiro at Angela's house.[2] Appellant was armed with a handgun. Later that night, appellant and his friends left Angela's house and drove in Peiro's car towards a restaurant in Silver Spring, Maryland. While they were driving, they changed direction because Angela knew of a house where they could go and "hang out." Angela directed Peiro to Belt Road and then instructed him to park a few houses down from the Spevaks' house. All three of them exited the car and were walking towards the house when Angela instructed Peiro to go back to the car and retrieve a baton. Angela then realized she already had the baton in her pocket and they continued towards the house. Peiro testified that, at that point, he knew they were not going to the house to hang out because if they were just going there to drink they would not need weapons.

When they reached the front porch, Peiro stood in front of the door, Angela was next to him, and appellant was standing behind him on the steps. As instructed by Angela, Peiro knocked on the front door and when an elderly man, Michael Spevak, answered, Peiro asked for "Anna." [3] Mr. Spevak told him that Anna did not live there. Peiro then forced the door open, pushed Mr. Spevak inside the house, and began choking him, and then appellant and Angela walked in behind him. After appellant and Angela entered the home, an elderly woman, Virginia Spevak, asked what was going on, and appellant pointed his gun in her face. Appellant, Angela, and Peiro then took turns guarding the Spevaks and looking around the home for valuables to steal. Eventually, both Spevaks were tied up and gagged. Angela said that they would have to kill the Spevaks because they had recognized her. Angela retrieved a knife from the kitchen and stabbed the Spevaks. Peiro used the baton to beat them. Appellant waited inside of the front door while the murders took place. Angela and Peiro carried the stolen items to Peiro's car, and then appellant joined them. After getting in the car, appellant said, "Whatever we did, they had to be dead because if not we were going to end up going to jail." Angela and Peiro brought appellant back to his house and then later returned to the Spevaks' home to make sure that they were dead. After

1. In violation of D.C.Code §§ 22–2101, –4502, –3601(a) (2001). Appellant was also convicted of: two counts of second-degree murder, in violation of D.C.Code § 22–2103 (2001); first-degree burglary while armed, in violation of D.C.Code §§ 22–801(a), –3601(a), –4502 (2001); first-degree theft of a senior citizen, in violation of D.C.Code §§ 22–3211, –3212(a), –3601(a) (2001); armed robbery of a senior citizen, in violation of D.C.Code §§ 22–2801, –4502, –3601(a) (2001); six counts of possession of a firearm during a crime of violence, in violation of D.C.Code § 22–4504(b) (2001); and two counts of carrying a pistol without a license, in violation of D.C.Code § 22–4504(a) (2001).

2. Peiro and Angela share the same surname, Hernandez, but are not related. To avoid confusion, we will refer to them by their first names.

3. Anna Alvarez was the Spevaks' foster daughter for six years.

observing the Spevaks' lifeless bodies through windows, Angela and Peiro stole the Spevaks' car.

The Spevaks' bodies were discovered two days later when police responded to concerned calls from the Spevaks' daughter and neighbor. Shortly after discovering the Spevaks' bodies, the police discovered a burning car, which they identified as the Spevaks' missing car, in the alley behind Angela's house. The police also discovered burnt items related to the Spevaks, including a wallet and credit card, in the same alley. Angela voluntarily accompanied the police to be interviewed. The information provided by Angela led the police to focus on Peiro and appellant, who was known to his friends as "Chancho."

Appellant was represented at trial by two court-appointed attorneys, Ferris Bond and John Machado. Mr. Bond was initially appointed to represent appellant on March 16, 2009. Because appellant does not speak or read English, Mr. Bond requested that a Spanish-speaking attorney be appointed to assist in the representation. On October 23, 2009, after a bench conference addressing Mr. Bond's request, the court appointed attorney John Machado as co-counsel.

On October 7, 2010, before trial began, a hearing was held to address a letter that the trial court received from appellant.[4] The following exchange took place:

THE COURT: So we're rapidly approaching trial. And I got a correspondence from Mr. Portillo which I forwarded to—a copy to the government and a copy to counsel for Mr. Portillo.

And because it raises issues that could conceivably affect the trial moving forward, I thought it wise that the government's suggestion to hold a hearing now and see what the problems are and how best to resolve it [sic].

So let me defer to defense counsel.

MR. BOND: Well, I suspect Mr. Portillo is going to have some things he wants to say to the court. Let me start by telling you that the letter and alleged pleading you received was not written by Mr. Portillo. Apparently there are a group of prisoners at the jail that spend a lot of time in the law library and they indicated to Mr. Portillo that they could help him by writing this letter. The signature on there is also not Mr. Portillo's.

Mr. Portillo as I think the court and the United States is aware does not speak English, doesn't write English. He has had some concerns. And we have talked about those concerns. And I think we've straightened them out. But he can speak to that himself. And I can go into more detail about his concerns if the court would like or the court's pleasure.

THE COURT: Well, let me defer to Mr. Portillo. And if I reach a point I rather hear [sic] from you I'll come back to you.

MR. BOND: Very well.

THE COURT: Yes, sir.

THE DEFENDANT: I want to tell him that I have requested some papers with [sic] in Spanish from him. I don't know how to write or read in the English language. And I was never given those papers. I would like to request that

4. The letter stated:
Now comes this Defendant Pro–Se [sic], asking that appointed counsel be removed as this Defendants [sic] Trial Attorney.... This defendant contends that trial counsel has not shown any interest in defending this defendant. Defendant contends that he has

made numerous attempts at contacting counsel, and yet counsel has not responded at all in over 7 months. This defendant does not feel safe going to trial with said Attorney "F. Bonds," and therefore request [sic] new counsel.

each time I'm given a paper that it be written in English and in Spanish. Because I don't understand. I do have some papers, but I don't know what is written in them. I feel that this is an attorney who's very busy and he's not trying hard regarding my case.

THE COURT: Well, you've said a few things. Let me see if I could address them perhaps in reverse order. Ferris Bond is an attorney who's very busy and I'm not sure he speaks any Spanish.

Do you speak Spanish?

MR. BOND: Poquito.

THE COURT: He speak[s] very little Spanish.

MR. BOND: Some. I understand—

THE COURT: You just went from very little to some.

MR. BOND: Both of the above. I understand—

THE COURT: Well, in that case you should have put Machado on the case.

MR. BOND: Yes, sir.

THE COURT: You did trick him? [sic]

MR. MACHADO: I'm in the very fluent department as opposed to poquito, Your Honor.

THE COURT: I'm not clear that I can have every document affecting your case provided to you in English and Spanish. What I have done is to take the unusual step of appointing you a second lawyer who's also very busy, but who like Mr. Ferris Bond is also very dedicated to defending persons who are indigent, unable, to afford a lawyer who they might want to go out and hire. Lawyers like Mr. Bond and Mr. [Machado] make it their life's avocation to represent such people in courts here in the United States.

Mr. [Machado] happens to be very fluent in Spanish. He probably speaks better than you do. How much education have you had?

THE DEFENDANT: He speaks Spanish but he did not—he would not go to visit me in jail.

THE COURT: How much education have you had?

THE DEFENDANT: Education? What do you mean?

THE COURT: That probably answers my question right there. You don't know what education is?

THE DEFENDANT: Of course.

THE COURT: Then how many years have you spent in school?

THE DEFENDANT: I studied seven years.

THE COURT: You studied seven years in school yet you're over there learning from people whose [sic] been in school about seven years like you have over at the jail. Intelligent people learn how to listen. Do you think you know how to listen?

THE DEFENDANT: Of course I know how to listen to people.

THE COURT: Then you should do some listening when these two men who [sic] are talking to you.

THE DEFENDANT: I don't feel okay. I don't feel comfortable with what this attorney tell[s] me.

THE COURT: I can't do anything about how comfortable you feel. See, my job among other things is to make sure that you have effective legal representation. Now for you I've multiplied that by two.

Now, let me tell you something, your trial is going to start on the first of November. And you said something that's correct a few minutes ago that these lawyers are very busy. Your case is very important, but so is every case they have. Because every other person

who's charged with a crime face[s] some prison time [and] wants their attention just as much as you do.

And I don't think you want a lawyer representing you who don't [sic] have time to do anything except come over there and hold your hand over at the DC Jail.

Lawyers who are very busy tend to be the ones who know what they're doing. Lawyers who don't have any business, well, you don't want them. So you need to spend the next hours and days trying to work with these people getting ready for trial.

Now, speaking of English and Spanish translations, the government has just approached me and asked me to authorize them to release some matters that would otherwise be protected by grand jury to the defense. And I've authorized that release.

But I put a restriction on it because I don't want grand jury material circulating around D.C. Jail. So it's for you. And you can discuss it with your client but he cannot have a copy of it.

MR. MACHADO: Yes, sir.

MR. BOND: Understood.

THE COURT: Anything else? You've got investigators working on the case?

MR. BOND: We do.

THE COURT: We've got a trial on the first of November.

MR. BOND: We do.

MR. MACHADO: Yes.

THE COURT: Now if you rather [sic] have those fellas over at the jail represent you, you let me know. All right?

MR. BOND: Thank you, Your Honor. Have a good day.

Although the trial was scheduled to start on November 1, 2010, due to a scheduling conflict, it actually began on November 29, 2010. After a six-day trial, the jury found appellant guilty of: two counts of first-degree felony murder while armed; two counts of second-degree murder; first-degree burglary while armed; first-degree theft of a senior citizen; armed robbery of a senior citizen; six counts of possession of a firearm during a crime of violence; and two counts of carrying a pistol without a license. Appellant was sentenced to a total term of 137 years and six months of incarceration.

## II.

Appellant argues that: (1) the trial court's failure to conduct an adequate inquiry into his pretrial ineffective assistance of counsel claim pursuant to the *Monroe–Farrell* line of cases constitutes reversible error; (2) the trial court committed plain error by failing to intervene *sua sponte* to correct alleged inaccuracies in the government's closing argument; (3) the jury instructions constructively amended the indictment; and (4) remand is required for resentencing because certain of his convictions merge.

### A.

■ Appellant argues that the trial court failed to meet its "constitutional duty to conduct an inquiry sufficient to determine the truth and scope of defendant's allegations [of ineffective assistance of counsel]." *Monroe v. United States,* 389 A.2d 811, 820 (D.C.1978) (citations omitted).

■ When a criminal defendant "alleges pretrial that defense counsel is unable to render reasonably effective assistance, due to his lack of preparation or other substantial reason, the Sixth Amendment imposes an affirmative duty on the trial court to conduct an inquiry into the complaint." *Farrell v. United States,* 391 A.2d 755, 760 (D.C.1978) (citation omit-

ted).[5] This inquiry has come to be known as a *"Monroe–Farrell* inquiry" or *"Monroe–Farrell* hearing." *See, e.g., McFadden v. United States,* 614 A.2d 11, 18 (D.C. 1992); *Nelson v. United States,* 601 A.2d 582, 592 (D.C.1991). We have declined to set forth a specific list of questions that the trial court must ask during this inquiry, instead observing that "the precise scope of the inquiry undertaken is necessarily dependent upon the circumstances presented in each individual case, and thus must be committed to the sound discretion of the trial court." *Monroe, supra,* 389 A.2d at 821. However, the "inquiry must be sufficiently specific and thorough to elucidate counsel's degree of compliance with the suggested criteria of professional competence, ... and thus 'the truth and scope of the defendant's allegations.'" *Farrell, supra,* 391 A.2d at 760–61 (quoting *Monroe, supra,* 389 A.2d at 820–21). "Our review of such an inquiry will focus—as must the trial court's—on the situation existing at the time of the inquiry." *Monroe, supra,* 389 A.2d at 821.

■ In this case, there is no dispute that appellant's letter triggered the trial court's duty to conduct a *Monroe–Farrell* inquiry. Rather, the dispute is over whether the above-quoted inquiry was adequate. We conclude that it was not. Not only was the trial court's inquiry legally insufficient, but as the lengthy colloquy quoted above illustrates, the nature of some of the court's comments—which might have been perceived as dismissive of appellant and his expressed concerns—

could have impaired the required inquiry by making the defendant feel less than comfortable voicing legitimate concerns about his legal representation. Many defendants, particularly those with limited educations and those who do not speak English, may feel intimidated by being in a courtroom before a judge. Exchanges such as the one that occurred in this case could frustrate the purpose of a *Monroe–Farrell* inquiry, which is to "determine the truth and scope of the defendant's allegations." *Monroe, supra,* 389 A.2d at 820.

■ Through his letter and oral communications to the court on the day of the *Monroe–Farrell* inquiry, appellant raised serious concerns about a lack of communication with his lawyers. In his letter, appellant alleged that he had tried numerous times to contact Mr. Bond and had not received a response in over seven months. At the hearing, appellant expressed concerns that he could not understand the documents being provided to him by his lawyers because they were all in English. Furthermore, appellant alleged that his Spanish-speaking lawyer, Mr. Machado, refused to visit him in jail. "This court has emphasized that a defendant is entitled to adequate preparation by, and consultation with, counsel, which 'often may be a more important element in effective assistance of counsel to which a defendant is entitled than the forensic skill exhibited in the courtroom.'" *McFadden, supra,* 614 A.2d at 13–14 (quoting *Monroe, supra,* 389 A.2d at 819 (quotation omitted)). Criteria

---

5. As we explained in *Monroe,* the court's constitutional duty to conduct this inquiry stems from the fundamental right to effective assistance of counsel—that is, performance "within the range of competence demanded of attorneys in criminal cases"—guaranteed by the Sixth and Fourteenth Amendments. 389 A.2d at 816–20 (quoting *McMann v. Richardson,* 397 U.S. 759, 771 & n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)). "Because the assistance

of counsel is requisite to the very existence of a fair trial, the right to such assistance invokes, of itself, the protection of the trial court." *Id.* at 816 (citations and internal quotation marks omitted). Furthermore, "timely judicial intervention at the pretrial stage constitutes an effective mechanism for the *prevention* of Sixth Amendment deprivations and for the simultaneous preservation of the integrity of the adversary trial process." *Id.* at 819.

for determining whether defense counsel's preparation was within the normal range of competence required in preparing criminal cases include:

(1) whether counsel conferred with the defendant as often as necessary and advised him of his rights, (2) whether counsel elicited from the defendant matters of defense and then ascertained if any potential defenses were unavailable, and (3) whether counsel conducted *both* factual and legal investigation sufficiently in advance to permit reflection and to determine if matters of defense could be developed.

*(John) Matthews v. United States*, 459 A.2d 1063, 1065 (D.C.1983) (citing *Monroe, supra*, 389 A.2d at 821) (emphasis added). Here, the trial court's inquiry was insufficient to determine whether defense counsel's preparation was within the range of competence required in preparing criminal cases. The only question the trial court asked regarding counsel's preparation for trial was whether they had an investigator working on the case. However, factual investigation is only one criterion of defense counsel's preparation. Furthermore, appellant's concerns were primarily related to what he perceived as a lack of communication, and the trial court did not follow up on appellant's concerns with questions to appellant or counsel to determine "the truth and scope of the defendant's allegations." *Monroe, supra*, 389 A.2d at 820–21. The trial court's assertion—"[l]awyers who are very busy tend to be the ones who know what they're doing"—cannot substitute for an inquiry into counsel's preparation for this case. *See Mills v. United States*, 796 A.2d 26, 31

(D.C.2002) (concluding that the trial court failed to conduct an adequate *Monroe–Farrell* inquiry where the court appeared to assume that defense counsel had adequately prepared in the instant case based on his prior trial performance); *Nelson, supra*, 601 A.2d at 592 ("Simply declaring that counsel was a competent attorney ... did not establish that she was capable of rendering adequate assistance *in this case*."); *Monroe, supra*, 389 A.2d at 822 ("[The] view that since defense counsel was a generally competent attorney, he *ipso facto* was able to render adequate assistance to appellant *in this case* ... [is] an improper basis on which to predicate such a conclusion.").[6] Therefore, on this record, we conclude that further inquiry was necessary for the trial court to meet its obligation to "put to defense counsel (and to the defendant, if necessary)—*on the record*—specific questions designed to elicit whether or not the ... criteria of professional competence have been met." *Monroe, supra*, 389 A.2d at 821.

Contrary to the government's contentions, this is not a case like *Forte v. United States*, 856 A.2d 567 (D.C.2004), where a divided panel of this court concluded that the trial court's *Monroe–Farrell* inquiry was adequate. In *Forte*, the appellant wrote a letter to the trial court raising concerns about his counsel's preparation for trial, specifically that his counsel had not been to see him and had not given him information concerning his case. 856 A.2d at 571–72. We concluded that appellant's concerns were sufficiently addressed by a dialogue between the trial court and counsel, which "reveal[ed] that in response to

**6.** During the *Monroe-Farrell* inquiry, the trial court observed, "[M]y job among other things is to make sure that you have effective legal representation. Now for you I've multiplied that by two." However, the fact that the trial court appointed appellant a second lawyer at defense counsel's request also does not substitute for an inquiry into counsel's preparation. Nor did it address the specific concerns appellant raised regarding the failure of both attorneys to communicate with him.

appellant's letter counsel visited appellant, wrote him a letter and conversed at length with him regarding his case and concerns, explained to appellant the plea process, and provided him a copy of the case file." *Id.* at 575. In this case, we know only that Mr. Bond spoke with appellant regarding his concerns and thought they had "straightened them out." Importantly, unlike Forte, who never expressed that his concerns had not been rectified once brought to defense counsel's attention, *id.* at 576, appellant continued to express his concern to the trial court after Mr. Bond's reassurance that the problems had been resolved. Also unlike Forte, who received a copy of the case file, which he could presumably read, *id.* at 575, appellant, a Spanish-speaker, was only given copies of documents regarding his case in English and there is no indication in the record that those documents, or indeed anything about the case, were ever explained to appellant by his Spanish-speaking attorney or through an interpreter. In short, indications that defense counsel had adequately prepared a case and consulted with his or her client, which were present in *Forte,* are absent in the present case because no

questions were posed by the trial court to counsel to establish on the record what steps counsel had taken to prepare appellant's case.

 In light of our conclusion that the trial court's *Monroe–Farrell* inquiry was insufficient in this case, we must determine the appropriate remedy. *McFadden, supra,* 614 A.2d at 16 ("[E]ither reversal or remand is an appropriate remedy, depending on the circumstances of the case." (citing *Bass v. United States,* 580 A.2d 669, 671 (D.C.1990))). We reverse outright when there is obvious prejudice or when it is clear from the record that pretrial counsel was ineffective.[7] *See McFadden, supra,* 614 A.2d at 17–18 (reversing because the trial judge failed to conduct a *Monroe–Farrell* inquiry and the record revealed "that there was inadequate trial preparation and consultation by counsel"); *Farrell, supra,* 391 A.2d at 762 (reversing where appellant was obviously prejudiced by his choice to proceed *pro se* after his request for new counsel was denied following a deficient inquiry into counsel's preparedness).[8]

7. We will affirm despite an inadequate inquiry, however, where it is clear from the record that pretrial counsel was effective. *See Monroe, supra,* 389 A.2d at 822–23 (holding that although "the court's omission of meaningful inquiry into appellant's claim ... would normally constitute reversible error," reversal was not required because "the *sua sponte* declarations by defense counsel on the record ... as to the steps he had taken in the preparation of appellant's defense and the consultations he had had with appellant" established that there was "no basis on which the preparation of appointed defense counsel or his consultations with his client could be considered constitutionally defective").

8. We also reversed in *Pierce v. United States,* 402 A.2d 1237 (D.C.1979), a case that does not obviously fall into the category of cases described above in which we found reversal appropriate. In *Pierce,* trial counsel, in the

presence of the defendant, asked the court to appoint additional counsel with more experience in light of the severity of the charges, which included first-degree murder. 402 A.2d at 1238–41. After discussion with counsel, the trial court set a status hearing for the following week to allow time for trial counsel to speak to attorneys about assistance. *Id.* at 1241. At that status hearing, and outside of the presence of the defendant, who was in the cell block at the time, defense counsel withdrew his request. *Id.* Without consulting the defendant, the trial judge accepted counsel's withdrawal of his request for co-counsel and set a trial date. *Id.* at 1242. A divided panel of this court reversed, explaining that "[o]nce the court tentatively made the decision that this was not an 'extremely difficult case,' there was no inquiry sufficient to determine whether counsel could effectively represent appellant 'within the range of competence demanded of attorneys in criminal cases.'"

However, we have found it appropriate to remand for a *Monroe–Farrell* inquiry where the record is unclear as to whether pretrial counsel may have been effective because: (1) no inquiry was conducted,[9] (2) the inquiry was inadequate and did not develop a sufficient record of counsel's pretrial preparation,[10] or (3) there was a sufficient amount of time between the complaint and the start of trial to allow counsel to prepare.[11]

In this case, the *Monroe–Farrell* inquiry was insufficient to develop an adequate record regarding whether trial counsel's pretrial performance was deficient. The only information elicited about counsel's preparation for trial was that they had an investigator working on the case. However, as explained earlier, factual investigation is only one part of preparing for trial. *See Monroe, supra,* 389 A.2d at 821 (explaining counsel's obligation to communicate with client and to conduct legal investigation). The record in this case is silent as to counsel's legal preparation and underdeveloped as to counsel's communication with their client. Therefore, remand is appropriate. *See Nelson, supra,* 601 A.2d at 592.

Remand is also a more appropriate remedy than reversal in this case because the inquiry took place approximately three weeks before trial was scheduled to start and approximately seven weeks before it

*Id.* at 1245 (quoting *McMann, supra* note 5, 397 U.S. at 771, 90 S.Ct. 1441). "The trial court thus failed in its responsibilities to protect the right of an accused to have the effective assistance of counsel." *Id.* (citation, internal quotation, and brackets omitted). The most practical explanation for why *Pierce,* a case which today might lead to a remand, resulted in a reversal is that *Pierce* was decided before *(John) Matthews v. United States,* 459 A.2d 1063 (D.C.1983). *Matthews* was the first case presenting a *Monroe–Farrell* issue that resulted in a remand for the trial court to conduct a new *Monroe–Farrell* inquiry. *See* 459 A.2d at 1066. *Matthews,* like *Pierce,* was decided by a divided panel. Chief Judge Newman, the author of the opinions in *Monroe, Farrell,* and the majority opinion in *Pierce,* dissented in *Matthews,* expressing the view that the Sixth Amendment rights of the defendant could not be protected by a remand for an evidentiary hearing with respect to the defendant's ineffective assistance of counsel claim because the case would no longer "be fresh in the minds of those who were involved and not even the defense counsel and the defendant are likely to remember the details and extent of the defense counsel's pretrial preparation" and "[t]he attorney will have incentive to exaggerate his pretrial preparation in order to protect his professional reputation." *Id.* at 1067. However we may feel about the debate that took place in *Matthews,* we are bound by subsequent cases, which make clear that "either reversal or remand is

an appropriate remedy, depending on the circumstances of the case." *McFadden, supra,* 614 A.2d at 16 (citation omitted).

9. *(Leon) Matthews v. United States,* 629 A.2d 1185, 1193 (D.C.1993) (remanding where there was no pretrial hearing "to afford the government an opportunity to demonstrate that trial counsel's pretrial preparation was adequate"); *(John) Matthews, supra,* 459 A.2d at 1066 (remanding where "the trial court failed to hold any hearing at all prior to trial upon appellant's pretrial assertion that his attorney had not prepared for his trial").

10. *Mills, supra,* 796 A.2d at 31–32 (remanding where "the trial judge appeared to assume that the defense counsel had prepared this case in a proper manner ... based on his prior trial performance" rather than conducting "the detailed inquiry required by our cases" (citations, internal quotation marks, and alterations omitted)); *Nelson, supra,* 601 A.2d at 592 (remanding where "[t]he court's questions and [appellant's] replies revealed nothing about the extent of defense counsel's preparation for trial or her communication with her client").

11. *Bass, supra,* 580 A.2d at 671 (remanding after no inquiry was held so that the trial court could consider "any relevant preparation that counsel might have conducted in the three months between the date of [appellant's] letter and the beginning of the trial").

actually started. *See Bass, supra,* 580 A.2d at 671. We cannot tell from this record whether appellant's lawyers satisfied their duty, either prior to appellant's complaints or subsequently in the weeks leading up to trial, to "confer with [their] client without undue delay and as often as necessary, to advise him of his rights and to elicit matters of defense or to ascertain that potential defenses are unavailable." *Monroe, supra,* 389 A.2d at 821 (citations omitted). Lack of communication was appellant's primary concern and will be an important area of inquiry on remand. Furthermore, although the trial court asked whether there was an investigator working on the case, the court did not determine whether the investigator spoke Spanish, had access to an interpreter, or received assistance from appellant's Spanish-speaking attorney, Mr. Machado, in the event that the investigation required communicating with persons who, like appellant, are not English-proficient.[12] On re-

mand, the trial court should consider all of the ways that language issues can impact pretrial preparation, including, but not limited to, lawyer-client communication and translation of documents related to the case, both specific concerns raised by appellant.[13]

On remand, the trial court must determine "whether or not, viewed pretrial, appellant was denied the effective assistance of counsel because trial counsel's pretrial preparation was not 'within the range of competence demanded of attorneys in criminal cases.'" *(Leon) Matthews, supra* note 9, 629 A.2d at 1202 (citing *Nelson, supra,* 601 A.2d at 592 (quoting *McMann, supra* note 5, 397 U.S. at 771, 90 S.Ct. 1441)).[14] The government bears the burden of persuasion and must show "by clear and convincing evidence that counsel's preparation for trial, viewed in its entirety, was effective." *Bass, su-*

12. During the bench conference discussing Mr. Bond's request for co-counsel about a year before the *Monroe–Farrell* inquiry, the trial court was informed that there was an interpreter working with the investigator. However, Mr. Bond represented to the court that the appointment of Mr. Machado would make the interpreter unnecessary because Mr. Machado could assist in the investigation. On remand, the trial court should clarify who, if anyone, was assisting the investigator to ensure that language issues did not hinder the investigation.

13. During the *Monroe–Farrell* inquiry, the trial court remarked, "What I have done is to take the unusual step of appointing you a second lawyer...." However, the trial court had an obligation to either appoint counsel who could communicate in appellant's language or provide an interpreter to facilitate lawyer-client communication. This was particularly so where Mr. Bond had represented to the court at an earlier hearing that the appointment of Mr. Machado, a Spanish-speaking attorney, would make the interpreter unnecessary. *See* D.C.Code § 2–1902(b)

(2001) ("In any criminal ... proceeding in which counsel has been appointed to represent an indigent defendant who is communication-impaired, a qualified interpreter shall be appointed to assist in communication with counsel in all phases of the preparation and presentation of the case."); *see also* AMERICAN BAR ASSOCIATION STANDARDS FOR LANGUAGE ACCESS IN COURTS (2012), Standard 6.3 ("Courts should require that language access services are provided for all court-appointed or supervised professionals in their interactions with persons with limited English proficiency."). "Courts can meet this obligation by appointment of an appropriately qualified bilingual professional or appointment and payment of interpreter services to facilitate the communication process." AMERICAN BAR ASSOCIATION STANDARDS FOR LANGUAGE ACCESS IN COURTS, Standard 6.3, Best Practices.

14. "Realistically, of course, we recognize that counsel's actual performance at trial will constitute circumstantial evidence on the issue of whether [they were] adequately prepared before trial." *Nelson, supra,* 601 A.2d at 592 (citation omitted).

*pra,* 580 A.2d at 671 (citation omitted).[15]

■ If the trial court concludes after the inquiry on remand that, viewed pretrial, appellant's Sixth Amendment right to counsel was violated, the judgments of conviction should be vacated and a new trial ordered. *(Leon) Matthews, supra* note 9, 629 A.2d at 1202. If the court concludes there was no such violation, "it shall make findings of fact on the record sufficient to allow meaningful appellate review, if appellant elects to seek such review." *Bass, supra,* 580 A.2d at 672.

**B.**

■ Appellant argues that, during closing argument, the prosecutor misstated the testimony of witnesses and argued facts not in evidence. Appellant takes issue with the following statements made during the prosecutor's closing argument: (1) "[Angela] is looking for a house. Angela is looking for a place to rob, to burglarize, to steal. And she knew just where to go."; (2) "Chancho [appellant], according to Mr. Hernande[z] knew exactly what was going on and he began to ask for Anna as well."; and (3) "This wasn't a party. This isn't them coming over to have a good time to hang out and drink beer. What was planned and understood all along now happens." Appellant argues that the prosecutor's statements are not based on reasonable inferences from the evidence adduced at trial.

■ In closing argument, a prosecutor may "make reasonable comments on the evidence" and "argue all reasonable inferences from the evidence adduced at trial." *Clayborne v. United States,* 751 A.2d 956, 969 (D.C.2000) (citation and in-

ternal quotation marks omitted). However, the prosecutor " 'may not go beyond reasonable inference and engage in impermissible speculation.' " *Id.* (quoting *Gardner v. United States,* 698 A.2d 990, 1001 (D.C.1997)). Because there was no objection to the prosecutor's remarks, we review for plain error only. *Lewis v. United States,* 541 A.2d 145, 146 (D.C.1988). In other words, we must "decide whether the trial judge committed plain error by failing to intervene *sua sponte." Irick v. United States,* 565 A.2d 26, 37 (D.C.1989). Under the plain-error standard of review, "we will reverse [appellant's] conviction only if the misconduct so clearly prejudiced his substantial rights as to jeopardize the fairness and integrity of his trial." *Id.* at 32. "[R]eversal for plain error in cases of alleged prosecutorial misconduct should be confined to 'particularly egregious' situations." *Id.* (quoting *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)).

The prosecutor's remarks in this case did not cross the line into impermissible speculation. Based on the evidence at trial, the jury could draw a reasonable inference that the burglary was planned all along and that appellant was aware of the plan. Evidence at trial supporting that inference included: Angela directed Peiro to park down the street from the Spevaks' home, indicating an attempt to conceal their presence; Angela told Peiro to return to the car to retrieve a weapon, and appellant was armed; Angela, Peiro, and appellant approached the Spevaks' darkened home at 1:30 a.m.; Angela told Peiro to ask for Anna, providing a ruse designed to facilitate entry into the Spevaks' home; actual entry into the house was forced

**15.** "[P]lacing on the government the burden of persuasion at the remand hearing 'serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision.' " *Nelson, supra,* 601 A.2d at 592 (quoting *Addington v. Texas,* 441 U.S. 418, 423, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)).

when Peiro pushed and choked Mr. Spevak; after Peiro, Angela, and appellant had located and collected some valuables, Peiro turned off the lights in the home "[s]o nobody would suspect anything"; Peiro testified that he knew they had not approached the Spevak home to "hang out" because they were armed; and Angela and Peiro carried stolen items to Peiro's car. *See Massey v. United States*, 320 A.2d 296, 299 (D.C.1974) (concluding that jury could infer entry with intent to steal where the defendant made "an early morning forcible entry, prepared to carry away items of value (clothes), and attempted to conceal his actions inside the premises"). Therefore, the trial court did not err by failing to intervene *sua sponte* to correct the prosecutor's characterization of the evidence.

## C.

■ Appellant argues for the first time on appeal that the trial court erred by constructively amending the indictment with respect to the charge of burglary by adding intent to assault as a possible mens rea sufficient to support conviction.[16]

■ The Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury...." U.S. Const. amend. V. "[A]fter an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself." *Stirone v. United States*, 361 U.S. 212, 215–16, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). "A constructive amendment occurs when the trial court permits the jury to consider, under the indictment an element of the charge that differs from the specific words of the indictment." *Peay v. United States*, 924 A.2d 1023, 1027 (D.C.2007) (citations and internal quotation marks omitted). When, as here, an objection has not been made at the trial level, "plain error review applies to a claim that an indictment has been constructively amended...." *Smith v. United States*, 801 A.2d 958, 962 (D.C. 2002) (citing *United States v. Cotton*, 535 U.S. 625, 631, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002)).[17]

■ An indictment charging burglary must specify the criminal offense that the defendant intended to commit when entering a dwelling. *See United States v. Thomas*, 144 U.S.App.D.C. 44, 46–47, 444 F.2d 919, 921–22 (1971); *see*

---

**16.** With respect to burglary, the indictment stated:

> On or about November 20, 2008, within the District of Columbia, Jose G. Portillo, also known as "Chancho", along with persons known to the Grand Jury, while armed with a dangerous weapon, that is a firearm, a baton and a knife, entered the dwelling of Michael Spevak and Virginia Spevak, both being persons sixty years of age or older, while Michael Spevak and Virginia Spevak were inside that dwelling with intent to steal property of another....

Regarding the intent necessary to convict appellant of burglary, the trial court instructed the jury: "[T]hat at the time of the entry the defendant intended to steal property of another or to commit the crime of assault. That's important. At the time of the entry that the

defendant intended to steal or to commit assault."

**17.** "Under plain error review, appellant must show that (1) there was an error, (2) the error was plain, and (3) the error affected his substantial rights." *Little v. United States*, 989 A.2d 1096, 1100 (D.C.2010) (citing *United States v. Olano*, 507 U.S. 725, 733–34, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Thomas v. United States*, 914 A.2d 1, 8 (D.C.2006) (citing *Johnson v. United States*, 520 U.S. 461, 467, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (citations and internal quotation marks omitted)).

*also Franklin v. United States,* 293 A.2d 278, 279 n. 2 (D.C.1972) (noting that indictment for burglary properly specified entry "with intent to steal the property of another" (citing *Thomas, supra,* 144 U.S.App. D.C. at 47, 444 F.2d at 922)). Although a burglary may be committed with multiple intents, such multiple intents should be reflected in corresponding, separate counts in the indictment. *See Baker v. United States,* 867 A.2d 988, 997 n. 2 (D.C.2005) (citing *Lee v. United States,* 699 A.2d 373, 384 (D.C.1997) and *Thorne v. United States,* 471 A.2d 247, 248 (D.C.1983)). Appellant's indictment for burglary included only intent to steal the property of another. The trial court's instruction to the jury added an additional intent under which the jury could find appellant guilty—intent to commit an assault—thereby permitting "the jury to consider, under the indictment, an element of the charge that differs from the specific words of the indictment." *Johnson v. United States,* 616 A.2d 1216, 1232 (D.C.1992) (citations and internal quotation marks omitted). This constructive amendment of the indictment was an error, which was plain, i.e., obvious or clear under current law. *See Whalen v. United States,* 379 A.2d 1152, 1156–57 (D.C.1977) (holding that indictment was constructively amended in violation of Fifth Amendment right to be charged by grand jury where the indictment originally required "intent to steal the property of another and to commit an assault" and was altered to allow conviction based on intent to commit only an assault), *rev'd on other grounds,* 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980).

However, appellant cannot demonstrate that the error affected his "substantial rights" or that "the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Johnson, supra* note 17, 520 U.S. at 467, 117 S.Ct. 1544 (citations and internal quotation marks omitted). In order for a plain error

to "affect substantial rights," the error must be of such a character "that viewed in the context of the trial, there is a reasonable probability that but for the error the factfinder would have had a reasonable doubt respecting guilt." *Wheeler v. United States,* 930 A.2d 232, 245 (D.C.2007) (citations and internal quotation marks omitted).

The indictment identified the specific date, location, and victims of the burglary, and the evidence introduced at trial reflected the same facts alleged in the indictment. The evidence introduced at trial tended to show that appellant entered the Spevaks' home primarily with the intent to steal (the intent charged in the indictment) and that any intent to assault was only secondary, i.e., appellant was prepared to assault the occupants (he was armed) *if* it was necessary to carry out a theft. Appellant did not know the Spevaks, and they did not know him, indicating that he did not enter their home with the intent to assault them. *See Warrick v. United States,* 528 A.2d 438, 442 (D.C.1987) (concluding that possession of a dangerous weapon at the time of entry into a home was insufficient to support conviction of burglary with intent to assault where the defendant did not know the homeowner). Rather, shortly after entering the Spevaks' home, appellant began to search for valuables to steal. Later, appellant helped to bind the Spevaks but did not assault them. *See Lee, supra,* 699 A.2d at 384 (concluding that the jury could infer intent to steal where the home was ransacked and the victims were bound and gagged); *Hawthorne v. United States,* 476 A.2d 164, 168–69 (D.C.1984) (concluding that there was sufficient evidence to support conviction of burglary with intent to steal where apartment was ransacked, items of property were missing, and occupant had been murdered). Appellant was also convicted of theft and robbery, indicating that he had the intent to steal when he entered the

Spevaks' home. *See Bowman v. United States,* 652 A.2d 64, 68 (D.C.1994) ("[T]he fact that appellant actually committed an assault very soon after he was inside the house is strong circumstantial evidence that he intended to commit an assault at the time he entered." (citation omitted)). Therefore, the evidence tended to show that appellant entered the Spevaks' home primarily with the intent to steal and that any assault was committed in furtherance of theft. Appellant has not identified any deficiency in the defense strategy at trial due to the discrepancy between the indictment and the jury instructions relating to the burglary charge. In fact, the theory that the prosecutor argued to the jury at trial was that appellant entered the Spevaks' home with the intent to steal.

Because the evidence presented at trial and the government's argument to the jury were consistent with the language of the indictment, appellant has failed to persuade us that the result of his trial would have been different if the trial court's instruction to the jury had more closely mirrored the language of the indictment. Appellant has also failed to demonstrate that the alleged error seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *See, e.g., Williams v. United States,* 51 A.3d 1273, 1282 (D.C.2012) ("As there was ample evidence from which the jury would rationally and unanimously conclude that appellant [committed the charged offense], appellant cannot demonstrate substantial prejudice or manifest injustice caused by the [alleged error]."). Accordingly, appellant has failed to meet his burden on plain error review, and we decline to disturb appellant's conviction of first-degree burglary while armed on this basis.

**D.**

Finally, appellant argues that we should remand for resentencing because certain of his convictions merge. The government agrees that certain of appellant's convictions merge but argues that resentencing is unnecessary. While we agree that some of appellant's convictions merge, and therefore must be vacated, we conclude that resentencing is unnecessary.

 Appellant's convictions of both second-degree murder and first-degree felony murder of the same victim cannot stand. *See, e.g., Thacker v. United States,* 599 A.2d 52, 63 (D.C.1991) ("When there is only one killing, the defendant may not be convicted of more than one murder."). Therefore, the trial court should vacate both of appellant's convictions for second-degree murder. Appellant's conviction for first-degree burglary while armed must also be vacated because it merges with his convictions for first-degree felony murder. *See, e.g., Newman v. United States,* 705 A.2d 246, 265 n. 19 (D.C.1997) (remanding because "the underlying felony will merge with the . . . felony murder" (citing *Whalen v. United States,* 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980))). Likewise, the convictions of possession of a firearm during a crime of violence associated with appellant's convictions for second-degree murder and first-degree burglary while armed must be vacated.[18] *See Morris v. United States,* 622 A.2d 1116, 1130 (D.C. 1993) (concluding that where two of appellant's convictions "merge to become one crime of violence or dangerous crime, there can be only one associated offense of possession of a firearm during a crime of violence" (internal quotation marks omitted)).

---

**18.** Therefore, three of appellant's possession of a firearm during a crime of violence convictions should be vacated. The three remaining possession of a firearm during a crime of violence convictions, which are related to appellant's convictions for armed robbery of a senior citizen and felony murder, may remain intact.

Where one option, vacating the non-felony murder and underlying felony or vacating the felony murder, more clearly effectuates the trial court's sentencing plan, we order the trial court to vacate convictions without resentencing. *See, e.g., Lester v. United States,* 25 A.3d 867, 872 (D.C.2011) (ordering the trial court to vacate the felony murder conviction which was to run concurrently with consecutive sentences for premeditated murder and attempted robbery). In appellant's case, the trial court sentenced him to consecutive sentences for the two felony murder counts and had the second-degree murder counts run consecutively with one another but concurrently with the felony murder counts. Therefore, resentencing is unnecessary because the trial court demonstrated a clear plan to have the sentence for felony murder be the determinative sentence.[19] Accordingly, we remand so that appellant's convictions of second-degree murder, first-degree burglary while armed, and the related possession of a firearm during a crime of violence convictions may be vacated.[20]

### III.

For the foregoing reasons, we remand this case to the trial court for further proceedings consistent with this opinion.

*So ordered.*

---

[19] The trial court's plan to make the felony murder sentence determinative is confirmed by the length of the sentences. Vacatur of appellant's convictions of second-degree murder and first-degree burglary while armed will not affect the total length of appellant's sentence, whereas vacatur of appellant's felony murder convictions would result in a substantial decrease in sentence.

[20] Of course, depending on the result of the trial court's *Monroe–Farrell* inquiry on remand, appellant may be entitled to a new trial, in which case all of his convictions would be vacated so that a new trial could be held.