*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 12-CF-265

MELVIN ANDRADE, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF3-21612-09)

(Hon. Michael Ryan, Trial Judge)

(Argued February 12, 2014                    Decided April 3, 2014)

*Craig N. Moore* for appellant.

*John P. Gidez*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney, and *Elizabeth Trosman*, Assistant United States Attorney, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY and THOMPSON, *Associate Judges*, and REID, *Senior Judge*.

REID, *Senior Judge*: A jury convicted appellant, Melvin Andrade, of the lesser-included offense of assault with a dangerous weapon, aggravated assault while armed, assault with significant bodily injury, and carrying a dangerous weapon. Mr. Andrade challenges his convictions mainly on the basis of the

prosecutor's negative comments about his use of an interpreter and the trial court's alleged failure to protect his right to an interpreter and a fair trial. Because we conclude that the trial court properly handled questions and comments by the prosecutor that appeared to express her personal opinion about Mr. Andrade's veracity, and that tended to denigrate and disrespect Mr. Andrade's right to and use of an interpreter to understand the proceedings against him, we affirm the judgment of the trial court.

## FACTUAL SUMMARY

The government presented evidence through several witnesses, including the victim, Elmer Cabrera. The evidence showed that Mr. Andrade and other young men, including S.T. and his uncle, were involved in a confrontation and altercation on September 12, 2009, with Mr. Cabrera and two brothers, Victor and Juan Carlos Rodriguez. The confrontation took place because S.T. had tried to take Mr. Cabrera's cell phone from him on September 9, 2009, and Mr. Cabrera had complained to a nearby policeman that the young men wanted to attack him, to take his phone and to rob him; the police stopped S.T. and another young man on the same day.

The confrontation on September 12 began when S.T. asked why Mr. Cabrera had approached the police on September 9 and threatened to "finish" him. Mr. Cabrera thought S.T. had a knife, and prepared to defend himself by taking off his jacket and belt. S.T. took the belt and Mr. Cabrera began to run. S.T. shouted, "stab him, stab him." Mr. Andrade stabbed Mr. Cabrera in the neck and arm. Dr. Juliet Lee, a general surgeon and trauma surgeon at George Washington University Hospital, treated Mr. Cabrera on September 12, 2009. She determined that he was stabbed in the neck/chest area, "just to the right of the sternal notch." Both of his lungs had collapsed and he was admitted to the intensive care unit.[1]

During his testimony, Mr. Andrade stated that he was twenty-one years of age, was born in El Salvador, had journeyed to the United States at age fifteen, and

---

[1] Mr. Andrade was the only defense witness. He testified that his friend Charlie, S.T. and his uncle were riding their bicycles. Mr. Andrade was behind the others. Soon he saw S.T. standing and apparently arguing with others. S.T.'s uncle took out a knife, and Mr. Cabrera and Juan Rodriguez took off their belts. As Mr. Andrade rode up, Juan Rodriguez went over to him, struck him, and threw him to the ground. Everyone started hitting and beating him. He started bleeding. When Mr. Cabrera told the Rodriguez brothers to pull out a pistol and point it at him, Mr. Andrade feared for his life, and in order to defend himself, he grabbed the knife from the ground that S.T.'s uncle had dropped when Juan Carlos hit his hand. Mr. Andrade stabbed Mr. Cabrera with the knife. Mr. Andrade went to the hospital and received twelve stitches.

received his high school diploma from the Bell Multicultural High School. Before trial began, the trial judge inquired about Mr. Andrade's need for an interpreter. The government announced that it had its own interpreter so that it could communicate with its own witnesses. Defense counsel announced that he did not need an interpreter to communicate with Mr. Andrade. The trial judge concluded that an interpreter was needed so that Mr. Andrade would "understand what transpires in the courtroom," and also for witnesses who only spoke Spanish. The deputy clerk announced that two interpreters had been ordered – one for the witnesses and one for Mr. Andrade. The next morning, the trial judge revealed that he had spoken with the head of Superior Court interpreting who indicated that Mr. Andrade was not using the interpreter. Defense counsel explained that "[a]lthough he does speak English, [Mr. Andrade] believes his English is not good enough to understand everything that is going on in the court and the terms and the language." Therefore, "[h]e prefers to have a Spanish interpreter" even if he did not use the interpreter consistently. The judge responded that he was "not trying to penalize [Mr. Andrade] in any way," but was "just trying to make sure that [he] shepherd[ed] the court's resources appropriately."

During the direct examination of Victor Rodriguez on August 17, the interpreter interrupted to explain to the judge that Mr. Rodriguez had used the word

"navaja," which has several meanings. The judge suggested that the prosecutor might want to make a more specific inquiry concerning Mr. Rodriguez' use of the word, and the prosecutor asked for a description of the knife that had been referenced. Later, the interpreter who relieved the first interpreter informed the court that the previous interpreter had initially and incorrectly interpreted a word as meaning "punch" rather than "to prick or to stab," before correcting the error. Near the end of the day, the prosecutor informed the trial judge that the interpreter had not fully translated a response by Mr. Rodriguez to a question on cross-examination. The judge informed the prosecutor that she could handle the matter during rebuttal. The prosecutor brought out the full response during rebuttal examination.

When Mr. Andrade testified, the interpreter interrupted several times to ask for clarification or repetition. During a bench conference, the judge and both counsel agreed that there were problems with the interpretation. The judge commented that the current interpreter was "very good" and that he had asked the interpreter's office not to permit the previous day's interpreter to return. The judge instructed the prosecutor to go back over testimony that had just been given to clarify what was said.

# ANALYSIS

Mr. Andrade's arguments on appeal center on interpreter issues, including the prosecutor's alleged prejudicial statements during cross-examination and in closing argument, and the alleged failure of the trial court to safeguard his right to an interpreter and a fair trial. Before setting forth the legal standard and the legal principles that will guide our review, we identify particular statements made by the prosecutor that, Mr. Andrade argues, infringed on his right to an interpreter and a fair trial.

First, during the prosecutor's rigorous cross-examination concerning Mr. Andrade's account of events, Mr. Andrade stated that either he did not understand well or the prosecutor did not understand him, and that he was "all confused." He complains about the following statement by the prosecutor:

> You were there, if you need a different interpreter, if you're not comfortable, you tell me because [you are] not going to hide behind translation. You initially said you were pulled off your bike when you were approached and now you're saying there's an entire knife fight and then you were riding by and then for no reason they came and got you. Which is it?

Defense counsel did not object. Mr. Andrade now argues that the prosecutor's statement "disparaged [him] and his testimony, clearly suggesting that it was false," and the statement constituted "a gratuitous, unsupported, and unjustified attack on the credibility of a Spanish-speaking defendant."

Second, in the midst of cross-examining Mr. Andrade about his account of the alleged attack on his person by the Rodriguez brothers and Mr. Cabrera, the prosecutor posed questions about Mr. Andrade's discussion with his lawyer, including the following:

> [D]id you talk about the questions you'd be asked
> by your lawyer before you came to court?

The trial court overruled defense counsel's objection, and the cross-examination continued as follows:

> Q: Did your lawyer . . . tell you what questions he was
> going to ask you in court?
>
> A: He just told me to tell the truth and that was it.
>
> Q: And you never discussed with your lawyer what

you're going to say in court?

A: No, no. He just told me to tell the truth.

Mr. Andrade argues that his "discussion[] with his attorney about anything related to his defense was out-of-bounds."

Third, Mr. Andrade complains about the prosecutor's statements during his attempt to explain his side of the story. For example, after establishing that Mr. Andrade did not know and had not spoken with Juan Carlos Rodriguez or Mr. Cabrera, and that he did not know Victor Rodriguez, the prosecutor declared:

> Well, I think what's important is that Victor and Juan Carlos, you're saying, I believe, were running from knives, had nothing against you, and instead decided to attack you off your bicycle.

Defense counsel did not object.[2]

---

[2] Later, the trial court sustained defense counsel's objection to the prosecutor's statement: "[I]t might be that it's hard to remember when it's not true; isn't that right?" In addition, the judge eventually told the prosecutor that he was not interested in narrative and that the procedure should be "Question, answer, question, answer." But, Mr. Andrade insists that by that time, "[t]he damage had been done."

Fourth, Mr. Andrade asserts that the prosecutor's closing argument contained improper statements; that "the impropriety of the prosecutor's closing argument was inextricably tied to the errors inherent in the cross-examination and to errors directly involving the interpreters; and that the prosecutor's "misconduct was sufficiently egregious to warrant reversal." Specifically, he cites as improper the prosecutor's statement that jurors should "imagine being put in [Mr. Cabrera's] position"; that Mr. Andrade's statement that his lawyer told him "to tell the truth" "is not believable"; that Mr. Andrade "tries to hide behind the interpretation"; and that "Spanish is not a very complicated language."

Our analysis is guided by the following legal principles. "If a defendant who is unable to speak and understand English is compelled to face criminal charges without access to effective translation of the proceedings by a competent and impartial interpreter, then his ability to present a defense may be substantially undermined, and there is a serious possibility of grave injustice." *Ramirez v. United States*, 877 A.2d 1040, 1043 (D.C. 2005) (quoting *Ko v. United States*, 722 A.2d 830, 834 (D.C. 1998) (en banc)) (internal quotation marks omitted). Under District law, a "communication-impaired person," including "a non-English or limited-English speaking person," is entitled to a "qualified interpreter." D.C. Code § 2-1902 (a) (2012 Repl.); D.C. Code § 2-1901 (2). A "non-English or

limited-English speaking person" is defined as "a person who is unable to readily understand oral and written communications in the English language or who cannot communicate effectively in the spoken or written English language." D.C. Code § 2-1901 (4). A "qualified interpreter" is one "who is listed by the [District's] Office of Court Interpreter Services or the United States Department of State as being, or [who] is "otherwise found by the [trial] court to be, skilled in the language or form of communication needed to communicate fluently with a communication-impaired person and to translate or interpret information accurately to and from the communication-impaired person." D.C. Code § 2-1901 (5).

Issues pertaining to the need for and use of an interpreter, including the appointment and competence of an interpreter, generally are committed to the sound discretion of the trial court, and this court will not disturb the trial court's rulings, unless the court abuses its discretion. *See Gonzalez v. United States*, 697 A.2d 819, 825 (D.C. 1997) (discussing the trial court's role in determining the competence of interpreters and the decision to appoint an interpreter); *see also Torres v. United States*, 929 A.2d 880, 888 (D.C. 2007). "[I]f the defendant . . . make[s] the court aware of any difficulties with the translator, then the court must take corrective action." *Guevara v. Unted States*, 77 A.3d 412, 424 (D.C. 2013) (internal quotation marks and citation omitted).

While this court's "function [is] to review the record for legal error or abuse of discretion by the trial judge, not counsel," *Irick v. United States*, 565 A.2d 26, 33 (D.C. 1989), the challenged comments of a prosecutor often determine whether the trial court responded properly – where an appellant claims on appeal that his conviction should be reversed because of improper cross-examination questions by the prosecutor and improper prosecutorial comments during closing arguments. Here, Mr. Andrade argues that some of the prosecutor's cross-examination questions and parts of her closing argument relating to the cross-examination questions were "sufficiently egregious to warrant reversal" of his convictions.

We turn to legal principles governing what the prosecutor may and may not do or say. "[A] prosecutor may make reasonable comments on the evidence and argue all reasonable inferences from the evidence adduced at trial." *Portillo v. United States*, 62 A.3d 1243, 1257 (D.C. 2013) (citing *Clayborne v. United States*, 751 A.2d 956, 969 (D.C. 2000)) (internal quotation marks omitted). "[C]ounsel may not express a personal opinion as to a witness's credibility or veracity" because "[i]t is for the jury to decide whether a witness is truthful and an attorney may not inject personal evaluations and opinions as to a witness'[s] veracity." *Diaz v. United States*, 716 A.2d 173, 179 (D.C. 1998) (citing *Dyson v. United States*, 418 A.2d 127, 130 (D.C. 1980)) (internal quotation marks omitted). Nor may counsel

"ask the jury to draw a negative inference from an accused's decision to consult with counsel." *Id*. at 179 (citing *Henderson v. United States*, 632 A.2d 419, 433 (D.C. 1983)). In addition, the prosecutor may not "make comments directed to the emotions and [assumed] prejudices of the jury." *Id*. at 180 (citing *Powell v. United States*, 455 A.2d 405, 410 (D.C. 1982)).

If there is no objection to the prosecutor's alleged improper question or comment, "we apply the 'stringent' plain error standard to determine if the trial court's failure to cure the allegedly improper comments was 'so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial.'" *Ball v. United States*, 26 A.3d 764, 772 (D.C. 2011) (quoting *McGrier v. United States*, 597 A.2d 36, 41 (D.C. 1991)). Where there is an objection and the question or comment is improper, we will affirm the conviction unless we conclude "looking at the gravity of the [impropriety], [its] direct relationship to the issue of guilt, the effect of specific corrective instructions by the trial court, and the strength of the government's case, that the defendant suffered substantial prejudice." *Fox v. United States*, 11 A.3d 1282, 1290 (D.C. 2011) (internal quotation marks and citations omitted). "There is no substantial prejudice if we can say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Id*. at

1290-91 (internal quotation marks and citations omitted).

In this case, the prosecutor's cross-examination of Mr. Andrade and her closing argument were intense and zealous. We have recognized that "the government may prosecute vigorously and zealously," but "the prosecutor is expected to know and abide by the rules of the court and [her] profession." *Diaz*, *supra*, 716 A.2d at 180 (citing *Powell*, *supra*, 455 A.2d at 408) (internal quotation marks omitted). Although the prosecutor may cast doubt on the veracity of a defendant through rigorous cross-examination, she may not "inject personal evaluations and opinions as to a witness' veracity." *Id*. at 179.

Our examination of the record constrains us to conclude that the prosecutor arguably transcended the bounds of permissible comment by raising cross-examination questions about Mr. Andrade's discussions with his attorney, making comments during cross-examination about his use of an interpreter and then using these parts of the cross-examination during closing argument to express an opinion about Mr. Andrade's veracity. In her cross-examination, the prosecutor commented on Mr. Andrade's use of an interpreter by telling him, "you are not going to hide behind translation." She also posed questions about whether his lawyer informed him about the "questions he was going to ask [him] in court," and

elicited the response, "[h]e just told me to tell the truth and that was it." As she

delivered her closing argument, the prosecutor said, in part:

> [W]hen I was asking questions [Mr. Andrade] was sort of like oh, this is confusing. I don't really know. Can I just start from the beginning?
>
> So I said, well, you know what, you knew what your attorney was going to ask you, right, versus my questions? Do you know what he said? He said no. My attorney never talked to me about the facts of this case or what I was going to say in court. His attorney gave an entire opening statement, summarizing everything that man was going to say on the stand. But he tells you, no, I didn't talk to him at all. He just told me to tell the truth. That is not believable.
>
> And then he tries to hide behind the interpretation, maybe, maybe she doesn't translate for you. My questions were simple and they were direct and Spanish is not a very complicated language. And these are certified [c]ourt [r]eporters.

By concluding that "[t]hat is not believable" and "he tries to hide behind the

interpretation," arguably the prosecutor injected her personal evaluation and opinion

about Mr. Andrade's veracity. *See Harrison v. United States*, 76 A.3d 826, 843-44

(D.C. 2013). While the prosecutor's comments about Spanish not being a

complicated language and about the interpreters being certified court reporters may

not have risen to the level of impermissible comment, they not only were

unnecessary and disrespectful to the trial court's appointment of the interpreters and the right of a limited-English speaking person to an interpreter, but the words also ignored the fact that there were clear problems with and questions about the interpretation that the trial court recognized and about which the court took corrective action. In addition, the prosecutor was quite insensitive to the fact that Mr. Andrade was born in El Salvador, arrived in the United States at age fifteen, and hence, did not have longstanding experience with the English language, even though he had a high school diploma and could converse in English. The record shows that he apparently had had no previous contact with the criminal justice system and may not have been familiar with its language and procedures. Indeed the trial judge recognized that Mr. Andrade needed an interpreter so that he would "understand what transpires in the courtroom."

Nevertheless, Mr. Andrade did not object to most of the questions and comments about which he complains on appeal, including the comments by the prosecutor during closing argument. Moreover, the record reveals that the trial court conscientiously endeavored to make sure that competent interpreters were assigned to translate, and even informed the Officer of Court Interpreter Services not to send one of the interpreters back to the courtroom. Where the translation possibly was in error, the trial judge ordered the parties to repeat certain questions

and answers, or allowed the prosecutor to correct the record during rebuttal examination. When the prosecutor said to Mr. Andrade, "it might be hard to remember when it's not true, isn't that right," the trial judge sustained defense counsel's objection. And, after the prosecutor continued to make comments during cross-examination, the trial judge eventually admonished her about her narrative, and instructed her to follow the procedure of "[q]uestion, answer, question, answer." In short, we are satisfied that the trial judge in this case took steps to make certain that in her zeal to obtain a conviction the prosecutor did not unduly infringe on the right of a person whose first language is not English, and who has been in the country for a relatively short period of time, to use an interpreter to understand technical and other unfamiliar language spoken during a criminal trial on serious charges. Under these circumstances, and given the government's evidence against Mr. Andrade, that the jury could weigh and credit, we discern no clear prejudice to Mr. Andrade's substantial rights as to jeopardize the very fairness and integrity of his trial, with respect to issues about which no objection was made in the trial court. Nor do we see any "substantial prejudice" with regard to questions about Mr. Andrade's discussions with his attorney – to which there was an initial objection. *See Ball*, *supra*, 26 A.3d at 772; *Fox*, *supra*, 11 A.3d at 1290.

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*