*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 19-CF-797

ALONZO JESSIE ATKINS, APPELLANT,

v.

UNITED STATES OF AMERICA, APPELLEE

Appeal from the Superior Court of the
District of Columbia
(2017-CF2-000733)

(Hon. Steven N. Berk, Trial Judge)

(Argued September 30, 2021                    Decided March 9, 2023)

*Adrian Madsen* for appellant.

*Michael E. McGovern*, Assistant United States Attorney, with whom *Michael R. Sherwin*, Acting United States Attorney at the time the brief was filed, *Elizabeth Trosman*, *Suzanne Grealy Curt*, and *Emile C. Thompson*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and EASTERLY and MCLEESE, *Associate Judges*.

BLACKBURNE-RIGSBY, *Chief Judge*:  In this case, Alonzo Jessie Atkins appeals his convictions of unlawful possession of a firearm with a prior crime of violence, D.C. Code § 22-4503(a)(1), (b)(1), and possession of an unregistered firearm, D.C. Code § 7-2502.01(a).  On appeal, he brings four claims.  Appellant

contends that the jury instruction for unlawful possession of a firearm with a prior crime of violence was required to include an element of mens rea, i.e., that appellant knew of his prohibited status as a felon in possession at the time. He also argues that the admission of out of court statements made by his girlfriend, Maurisha Singletary — a non-testifying witness unavailable at trial because she could not be located — was in violation of the Confrontation Clause. The crux of this argument pertains to statements Ms. Singletary made to Metropolitan Police Department ("MPD") officers during the investigation of an alleged home intrusion where she admitted there was no intruder and that appellant shot himself in the foot.[1] Appellant also alleges that the prosecutor invited a government witness to comment on the veracity of Ms. Singletary's statements and made impermissible comments in closing and rebuttal arguments. Finally, appellant argues that the sentence for possession of an unregistered firearm conviction was improperly enhanced.

As an initial matter, appellant concedes that his mens rea, Confrontation Clause, and prosecutorial impropriety arguments are subject to plain error review, as they were not raised before the trial court.[2] Reviewing these issues under plain

---

[1] Ms. Singletary was not present at trial. Her 911 call was admitted under the excited utterance hearsay exception, and her statement to MPD officers that appellant shot himself was admitted to impeach her 911 call.

[2] Appellant did preserve one argument related to the prosecutor's statements, as discussed in Part IIC.

error and, for the reasons discussed, we affirm appellant's convictions. However, due to the government's concession that it failed to file the appropriate sentencing enhancement notice prior to trial, we remand for correction of the appellant's enhanced sentence for possession of an unregistered firearm.

## I.      Factual Background & Procedural History

On January 13, 2017, at 12:30 a.m., Ms. Singletary called 911 claiming there was an intruder at her and appellant's apartment (located at 1641 V Street SE), and that the intruder shot appellant in the right foot. In her 911 call, Ms. Singletary informs the dispatcher that the intruder did not have an opportunity to take anything from the apartment. First responders arrived at the apartment, and appellant was transported to the hospital for care, accompanied by MPD Detectives Sean Moore and Robert Edelen. Ms. Singletary remained at the apartment.

After speaking with appellant at the hospital, Detectives Moore and Edelen returned to the couple's apartment to investigate. Upon returning, Detective Moore confronted Ms. Singletary about the alleged burglary, admitting that he used deceptive tactics on Ms. Singletary — telling her that appellant had confessed he shot himself, when appellant made no such statement. Ms. Singletary then divulged

that there was no intruder, appellant shot himself, and that she hid the shotgun. Ms. Singletary then led an MPD officer and Detective Edelen behind the apartment complex to an alleyway with trash cans where a shotgun was hidden and recovered. Detective Moore did not enter the alleyway but remained at the alley's entrance. Appellant was later arrested.

Appellant's trial commenced on November 14, 2018. After jury selection, but before witnesses were called, the parties challenged the admissibility of certain statements, particularly the introduction of statements made by Ms. Singletary because she could not be located to testify at trial. The parties disputed whether Ms. Singletary's 911 call and subsequent statement could be introduced under any hearsay exceptions. The trial court concluded that the 911 call would be admitted as an excited utterance. However, Ms. Singletary's later statement to officers — that there was no intruder, appellant accidentally shot himself, and that she hid the shotgun — would only be admissible for impeachment purposes, if the 911 call was introduced first. Appellant objected to the court's ruling, asserting that the later statement should be entirely excluded because its probative value was substantially outweighed by its prejudicial effect.

Detectives Moore and Edelen both testified. On direct, Detective Moore only testified about Ms. Singletary's actions, specifically, her leading Detective Edelen and an MPD officer to the hidden shotgun. The government did not elicit any statements Ms. Singletary made to the officers during direct examination. However, on cross-examination, defense counsel asked Detective Moore what Ms. Singletary said in response to police questioning regarding the location of the gun. Detective Moore responded that in his presence, along with Detective Edelen and Officer Peter Molina, "she said she took it outside and placed it behind the trash cans behind the apartment complex."

On direct examination, Detective Edelen testified about body worn camera footage of another officer. Detective Edelen stated that the video showed Ms. Singletary leading him and Officer Molina to the firearm, which required climbing over a fence. He also testified that when the shotgun was found, it was wrapped in either a sweater or a sweatshirt with leaves piled on top. Appellant did not cross-examine Detective Edelen.

MPD Officer Herbert Epstein, one of the first officers to respond, also testified on behalf of the government. He indicated that upon arriving, Ms. Singletary opened the door for Officer Epstein and Officer Molina. On cross, Officer Epstein testified

that he observed the state of the apartment, noting that cell phones, a stereo, a TV, and a gaming system were in the first room after entering. He testified that based upon his experience, of a little over a year, it did not appear that there was a burglary because nothing appeared to be missing and there was no sign of forced entry. Officer Epstein testified that the "story just was not adding up." Appellant interjected with an objection asserting speculation, but the trial court overruled the objection.

In addition to officers' testimony, the government presented testimony from two forensic scientists. Kawye Mentore processed evidence at the apartment and testified that he noticed a "defect" on the floor with "reddish-brown stains, possibly blood" in the rear bedroom of the apartment. Mr. Mentore testified that he removed a small metal fragment, which he opined "could possibly be a projectile from the shotgun shell." He also found a small piece of plastic, "consistent with a shotgun shell wad," near the area.

Jennifer Himrod, the forensic scientist who tested the firearm for DNA, testified that she tested wet-dry swabs taken from the discovered firearm and compared it to buccal swabs taken from appellant and Ms. Singletary. She testified that there was a mixture of DNA present on the firearm, but that it was 6.25 trillion

times more likely that appellant's DNA was present on the firearm, which she considered a reliable result. The results were inconclusive as to whether Ms. Singletary's DNA was present on the firearm.

As part of appellant's defense, Ms. Singletary's 911 call was admitted and played for the jury. In the recording, Ms. Singletary informed the 911 operator that an ambulance was required and that someone broke in and attempted to rob her home and shot appellant in the foot. With the introduction of the 911 call, the government recalled Detective Moore on rebuttal to introduce additional statements made by Ms. Singletary to impeach the 911 call.

On rebuttal, the government introduced audio from an MPD officer's body worn camera when Ms. Singletary was being confronted by detectives, and where she told officers that there was no intruder, and that appellant shot himself. Over appellant's objection, Detective Moore testified that he "basically let her tell [him] the truth about what happened." Appellant objected, stating that the "tape speaks for itself," which the trial court sustained. Appellant did not immediately make a request for a cautionary instruction relaying to the jury that the audio from the footage could only be considered for impeachment purposes. Detective Moore

proceeded, testifying that Ms. Singletary led Detective Edelen and Officer Molina through an alley behind the apartment complex where the gun was recovered.

During closing statements, the government recounted to the jury that:

> [W]e heard what happened when [Detective Moore or Detective Edelen] came back and talked to Miss Singletary. He said he told Miss Singletary he knew what happened, that the defendant shot himself in the foot. So just tell me the truth. And what did Miss Singletary do? She just opened up and told a completely different story than what she said on the 911 call.

The government then reiterated to the jury that it had "just heard the instruction about a prior inconsistent statement and that [it is] able to use that to determine the veracity — the truth of [Ms. Singletary's] earlier statement." The government also stated, that in order to prove possession,

> Well, you take that prior inconsistent statement and you compare it against this burglary story -- it just doesn't make sense. There's no sign of forced entry into the apartment. There's nothing missing from the apartment. There's a gunshot deep in the apartment . . . .
>
> [T]he [g]overnment will submit the evidence [that] points towards [the] fact that the second story that Ms. Singletary gave on the scene to be more likely. They got into an argument. The defendant had the gun, which is how his DNA got on the gun. And he shot himself in the foot.

In its closing statements, the government went into greater detail regarding Ms. Singletary's 911 call, discussing her breathing, hypothesizing why she was out of breath and not focused on answering the operator's questions. The government insinuated that while on the call Ms. Singletary was in the process of hiding the firearm: "[m]aybe she's walking outside hiding the gun while she's on the phone with the police." The government then returned to discussing Ms. Singletary's later statement, asserting:

> This whole idea of this burglary is completely debunked. There's no evidence to support it. And I'm not asking you to believe this statement . . . just because the statement was made. No. I'm asking you to believe it because of the facts that support it and the facts that don't support that 911 call.

The government concluded its closing statement with, "Miss Singletary said he had the gun in his hand," asserting that the later statement was "the truth," not the story told in the 911 call.

The trial judge instructed the jury in two parts with the parties giving closing arguments in between. Relevant to Ms. Singletary's statements, the trial judge gave the following prior inconsistent statement instruction:

The law treats prior inconsistent statements differently depending on the nature of the statements and the circumstances in which they were made. I will now explain how you should evaluate those statements. You have heard evidence that Maurisha Singletary made a statement on an earlier occasion and that this statement may be inconsistent with her testimony here at trial — well, may be inconsistent with what you were told about her statements. It is for you to decide whether the witness made such a statement and whether, in fact, it was inconsistent with the assertions of her — of her position here. If you find such an inconsistency, you may consider the earlier statement in judging the credibility of the witness. But you may not consider it as evidence that what was in the earlier statement was true.[3]

Following closing arguments, the trial judge provided the remainder of the jury instructions; specifically, the elements of the charged offenses.

The elements of the offense of unlawful possession of a firearm by a person previously convicted of a crime punishable by imprisonment for a term exceeding one year, each of which the [g]overnment must prove beyond a reasonable doubt, are that:

---

[3] Both parties agreed to the trial court's proposed modification of the written instructions to be provided to the jury. The written instruction, which differed slightly, stated:

You've heard evidence that Maurisha Singletary made a statement on an earlier occasion and that -- and that this statement may be inconsistent with statements referred to here at trial.

It is for you to decide whether the witness made such a statement and whether, in fact, it was inconsistent with the witness's prior position[.]

One, Mr. Atkins possessed a firearm;

two, he did so voluntarily and on purpose and not by mistake or accident; and,

three, at the time Mr. Atkins possessed the firearm, he had been convicted of a crime punishable by imprisonment for a term exceeding one year.

The jury found appellant guilty of both offenses, felon in possession of a firearm and possession of an unregistered firearm. For appellant's conviction of possession of a firearm with a prior crime, he was sentenced to 84 months incarceration, the execution to be suspended as to all but 36 months, and three years of supervised release suspended for one year of probation. As to the conviction of possession of an unregistered firearm, appellant was sentenced to 22 months' incarceration, and the execution of sentence suspended as to all, with three years of supervised release suspended for one year of probation. The trial court indicated that the sentences were to run concurrently. This appeal followed.

## II.    Discussion

As an initial matter, all but one of appellant's arguments are unpreserved, as appellant concedes. Thus, we review largely for plain error. *Wills v. United States*, 147 A.3d 761, 767 (D.C. 2016). Under plain error review, appellant is required to

show that a trial court's allowance of evidence was "(1) error, (2) that is plain, (3) that affects substantial rights[.]" *Otts v. United States*, 952 A.2d 156, 161 (D.C. 2008). "If all three [mentioned] conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Portillo v. United States*, 62 A.3d 1243, 1258 n.17 (D.C. 2013) (quoting *Thomas v. United States*, 914 A.2d 1, 8 (D.C. 2006)). Applying this test to appellant's unpreserved arguments, we conclude that none of appellant's arguments warrant reversal.

## A. Appellant's Knowledge of Prohibited Status as Evidence of an Element of Unlawful Possession of Firearm Charge

Because appellant asserts that we must reverse the unlawful possession of a firearm conviction, we address that argument first. Appellant asserts that reversal is required because the government failed to present evidence that appellant "knowingly" possessed a firearm unlawfully, and the trial court failed to instruct the jury as to a necessary mens rea element. As conceded by appellant, we review this issue for plain error.

Appellant argues that in order to prove his guilt of the crime of felon in possession of a firearm, D.C. Code § 22-4503(a)(1), the government had to prove

that he "had at a minimum, knowledge of his . . . prohibited status," i.e., that he knew that he was a felon, and that the jury should have been so instructed. Appellant relies in part on the Supreme Court's decision in *Rehaif v. United States*, 139 S. Ct. 2191 (2019), which interpreted the concededly differently-worded federal felon in possession statutes. Assuming without deciding the District's statute plainly requires such a showing and a corresponding instruction, however, appellant's claim fails under the third prong of the test for plain error.

Under the third prong, appellant must demonstrate that the error was clearly prejudicial to his substantial rights and jeopardized the fairness and integrity of his trial. *Portillo*, 62 A.3d at 1258 n.17. "[T]he Supreme Court has refused to apply a rule of per se reversal in all cases of [jury] instructional error, even those affecting core elements of the charged offense." *White v. United States*, 613 A.2d 869, 877 (D.C. 1992) (en banc) (examining *Yates v. Evatt*, 500 U.S. 391 (1991), and *Arizona v. Fulminante*, 499 U.S. 279 (1991)); *see also Johnson v. United States*, 520 U.S. 461, 464-65 (1997).

We find persuasive the Supreme Court's holding in *Greer v. United States*, 141 S. Ct. 2090 (2021). In *Greer*, the Court held that in federal felon-in-possession cases, the failure to instruct a jury as to the mens rea element is not structural error

warranting automatic reversal. *Id.* at 2099. The lack of instruction on the mens rea element in such cases "does not deprive defendants of basic protections without which a criminal proceeding cannot reliably serve its function as a vehicle for determination of guilt or innocence[.]" *Id.* at 2100 (internal quotation marks removed). Thus, even assuming a "*Rehaif* error" occurred, it is "not a basis for plain-error relief unless the defendant first makes a sufficient argument or representation on appeal that he would have presented evidence at trial that he did not in fact know he was a felon." *Id.* at 2100 (cleaned up). Otherwise, "the appellate court will have no reason to believe that the defendant would have presented such evidence to a jury, and thus no basis to conclude that there is a 'reasonable probability' that the outcome would have been different absent the *Rehaif* error." *Id.* at 2097.

Appellant does not sufficiently dispute his felony status and does not proffer representations that would support his position that he was unaware of his felony status at the time of the charged incident. At trial, appellant stipulated that he had previously been convicted of a felony. Appellant also does not dispute that in 2005, he was convicted and sentenced to 40 months imprisonment for armed robbery and 24 months imprisonment for assault with a dangerous weapon. His stipulation and lack of argument support a reasonable inference that appellant had knowledge of his prior felony conviction for the jury to utilize in reaching a conviction on the felon-

in-possession charge. There was no reasonable probability that the outcome would have been different. Thus, appellant has not shown reversible error.

## B. Confrontation Clause

We next address appellant's argument that the admission of Ms. Singletary's out of court statements violated the Confrontation Clause. Appellant concedes that his trial counsel did not raise a Confrontation Clause objection at trial, and so we review for plain error.

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. As such, the Sixth Amendment bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004); *see Young v. United States*, 63 A.3d 1033, 1039 (D.C. 2013). The Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford*, 541 U.S. at 59 n.9; *Williams v. Illinois*, 567 U.S. 50, 70 (2012) (emphasizing how *Crawford* reaffirmed the proposition that testimonial statements can be introduced without

violating the Confrontation Clause, so long as the statements are not used to establish the truth of the statements).

After appellant introduced Ms. Singletary's 911 call, in which she reported that there was an intruder, the government was permitted to introduce Ms. Singletary's contradictory out of court statements through the testimony of Detective Moore. Appellant contends that, functionally, this amounted to the admission of the statements as substantive evidence because the trial court failed to sua sponte immediately advise the jury that the statements were admissible only for impeachment. Appellant asserts that the trial court's inconsistent instruction to the jury was unclear and failed to "eliminate confusion about which of Ms. Singletary's statements could be considered as substantive evidence and which could only be considered for purposes of impeachment." Appellant contends that the error was further compounded by references to the statements in the government's closing and rebuttal arguments.

As we have explained, to receive relief under plain error review, appellant must establish the error was not only plain but also affected his substantial rights. *Portillo*, 62 A.3d at 1258 n.17. The error must be of such a character "that viewed in the context of the trial, there is a reasonable probability that but for the error the

factfinder would have had a reasonable doubt respecting guilt." *Id.* at 1259 (quoting

*Wheeler v. United States*, 930 A.2d 232, 245 (D.C. 2007)).

In this case, we cannot say that, even assuming there was an error, the error

was prejudicial to appellant's substantial rights. Even with no immediate instruction

provided, the jury was ultimately provided with prior inconsistent statement

instructions specific to the statements attributed to Ms. Singletary, both orally and

in writing.[4] These instructions came before and after the government's closing

arguments, therefore providing the jury with ample guidance. Where "the trial court

[has given] the jury a final charge which include[s] an instruction on the limited

purpose for which evidence of a prior inconsistent statement could be used," any

prejudice resulting can be sufficiently removed by the final instruction to ensure a

fair trial. *Johnson v. United States*, 387 A.2d 1084, 1089 (D.C. 1978).

Additionally, there was other strong evidence that appellant possessed the

firearm. There was body camera footage of Ms. Singletary leading an officer to the

location of the firearm, which supports the absence of a burglary because Ms.

---

[4] The trial court acknowledged some confusion in the first oral instruction given, which erroneously referred to Ms. Singletary's testimony at trial and mixed up the timing of Ms. Singletary's statements. The trial court proposed giving a clarified written instruction, to which both parties agreed.

Singletary led officers to the location of the hidden shotgun that injured appellant. The government also presented testimony from a forensic scientist who found a "defect" on the floor, along with a piece of plastic "consistent with a shotgun shell wad," and "reddish-brown stains," that were possibly blood. Furthermore, forensic DNA testing connected appellant to the recovered shotgun. In light of the court's instructions and the other inculpating evidence, appellant cannot show a reasonable probability that any error regarding the admission or use of Ms. Singletary's statements to Detective Moore as substantive evidence affected his substantial rights.

## C. Prosecutorial Impropriety

Appellant next argues that alleged prosecutorial impropriety warrants reversal. Appellant alleges that (1) the government impermissibly invited Officer Epstein to comment on the credibility of Ms. Singletary; and (2) the government, in closing and rebuttal, impermissibly commented on the evidence and witness veracity.

## 1. Officer Epstein's Testimony

First, appellant argues that the prosecutor invited Officer Epstein to comment on Ms. Singletary's credibility when testifying about his observations of the scene and asking Officer Epstein whether it looked like there was a burglary. In response, Officer Epstein testified that "[t]he story just was not adding up." The government asserts that its question to Officer Epstein was not offered to solicit Officer Epstein's opinion regarding Ms. Singletary's credibility, but rather his own opinion regarding the scene when he arrived. Appellant preserved this argument.

"When comments by the prosecutor are allegedly improper, we review to determine whether the trial court abused its discretion or committed legal error by allowing them." *Johnson v. United States*, 17 A.3d 621, 626 (D.C. 2011). We have said that "a fact witness may express an opinion so long as it is based on the witness' personal observation of events and is helpful to the jury in fulfilling its role as fact-finder." *Robinson v. United States*, 797 A.2d 698, 707 (D.C. 2002) (internal quotation marks omitted). However, it is "improper for the prosecutor to ask one witness to express a view or opinion on the ultimate credibility of another witness's testimony." *Poteat v. United States*, 559 A.2d 334, 336 (D.C. 1989) (internal quotation marks omitted).

Officer Epstein testified that he did not believe there was an attempted burglary because there were no signs of forced entry and no items of value appeared to be missing, even though a stereo, a TV, a gaming console, and cell phones were all in the front room of the apartment. He further testified the he determined, based on the scenario conveyed to him through the 911 call, that the scene did not accurately represent that there was a burglary. When Officer Epstein began to say that "[t]he story just was not adding up[,]" the trial court told the government to "move on[.]"

Officer Epstein testified to events he actually observed and expressed an opinion on those observed facts. He expressed no comment on witness veracity. Therefore, the trial court did not abuse its discretion in permitting Officer Epstein to testify regarding the scene and the 911 call.

## 2. The Government's Closing and Rebuttal Statements

Appellant next argues that the prosecutor impermissibly made statements about Ms. Singletary's credibility and the evidence in closing and rebuttal statements. Appellant did not object at trial, so we review for plain error.

"[I]n closing argument, counsel is permitted to make arguments and commentary as long as it is in the general nature of argument, and not an outright expression of opinion." *Bost v. United States*, 178 A.3d 1156, 1190 (D.C. 2018) (internal quotation marks omitted). "[C]losing arguments are seldom carefully constructed *in toto* in advance, and improvisation often brings about imperfect syntax and planning." *Shepherd v. United States*, 144 A.3d 554, 564 (D.C. 2016) (quoting *Dixon v. United States*, 565 A.2d 72, 79 (D.C. 1989)). A prosecutor is "entitled to make reasonable comments on the evidence and [urge] such inferences from the testimony as will support his theory of the case." *Irby v. United States*, 464 A.2d 136, 140 (D.C. 1983) (quoting *Tuckson v. United States*, 364 A.2d 138, 142 (D.C. 1976)). Regardless of improvisation in closing and rebuttal, "counsel may not express a personal opinion as to a witness's credibility or veracity because it is for the jury to decide whether a witness is truthful and an attorney may not inject personal evaluations and opinions as to a witness's veracity." *Andrade v. United*

*States*, 88 A.3d 134, 140 (D.C. 2014) (internal quotation marks and brackets omitted). "[I]mproper prosecutorial comments are looked upon with special disfavor when they appear in the rebuttal because at that point defense counsel has no opportunity to contest or clarify what the prosecutor has said." *Lee v. United States*, 668 A.2d 822, 830 (D.C. 1995) (quoting *Coreas v. United States*, 565 A.2d 594, 605 (D.C. 1989)).

In a plain error posture, we reserve reversal "to particularly egregious situations," *Portillo*, 62 A.3d at 1257 (internal quotation marks omitted), leaving us to determine if a failure to cure allegedly improper comments "was 'so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial.'" *Andrade*, 88 A.3d at 140 (quoting *Ball v. United States*, 26 A.3d 764, 772 (D.C. 2011)). "There is no substantial prejudice if we can say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Id.* (internal quotation marks omitted).

Appellant claims that during closing statements the government presented facts not in evidence. Appellant argues that the prosecutor expressed personal opinions regarding Ms. Singletary's credibility. Additionally, appellant contends

that the prosecution introduced new evidence by arguing that the presence of appellant's DNA on the gun connected appellant to the shotgun. Appellant highlights the following statements the government made:

> I want you to really evaluate [Ms. Singletary's 911 call] because I want you to notice a few things [] I noticed when I was listening[.]
>
> The only time she really gets panicked, ladies and gentlemen, on that phone call, when you listen to it – I wrote it down.
>
> This whole idea of this burglary is completely debunked.
>
> Well, I'm telling you how the DNA got there. He had the gun. Miss Singletary said he had the gun in his hand . . . . And she told them the truth.

We conclude that the government's statements, regardless of whether they were permissible, did not substantially prejudice appellant. Importantly, the jury was instructed, both orally and in writing, that it had the task of assessing Ms. Singletary's credibility:

> You've heard evidence that Maurisha Singletary made a statement on an earlier occasion and that -- and that this statement may be inconsistent with statements referred to here at trial. It is for you to decide whether the witness

made such a statement and whether, in fact, it was inconsistent with the witness's prior position[.][5]

This instruction was helpful as it, at a minimum, informed the jury that it was tasked with assessing the credibility of Ms. Singletary's multiple statements. "We ordinarily presume that the jury understands and obeys the trial judge's instructions." *Holloway v. United States*, 25 A.3d 898, 903 (D.C. 2011).

Moreover, unlike other cases where the government's case turned largely on the testimony and credibility of witnesses, the same is not true here. *Compare Moghalu v. United States*, 263 A.3d 462, 476 (D.C. 2021) (evidence connecting Moghalu to the shooting was based on the testimony of two individuals who engaged in criminal activity, who were impeached with prior inconsistent statements, who had a motive to work with the government, and who did not know Moghalu very well); *Anthony v. United States*, 935 A.2d 275, 285 (D.C. 2007) (evidence that Anthony possessed a handgun turned largely on credibility of an officer and defense witness). In light of the video footage of Ms. Singletary leading officers to the firearm, the prosecutor's statements on her credibility did not likely weigh heavily in convicting appellant. Detectives Moore and Edelen also testified that Ms.

---

[5] The quoted instruction was given to the jury in writing. The jury was also instructed orally. In the oral instruction, the jury was similarly directed that its role was to judge "the credibility of [Ms. Singletary]."

Singletary led Detective Edelen and Officer Molina to the firearm, which further bolstered the footage the jury saw.

Appellant's DNA on the firearm was also strong evidence that there was no burglary because it corroborated the inference that appellant touched the firearm. In addition, there was testimony from Officer Epstein, which also supported the inference that there was no burglary because there were no signs of forced entry and no valuables from the front room were taken.

Therefore, with respect to these various issues pertaining to the prosecutor's statements, regardless of whether they were permissible, we can say with fair assurance that "the judgment was not substantially swayed," *Andrade*, 88 A.3d at 140 (internal quotation marks omitted), and conclude that appellant has not shown that he was substantially prejudiced—whether viewing the statements in isolation or cumulatively, *Coreas*, 565 A.2d at 605 (assessing "whether the totality of the several instances of prosecutorial misconduct is prejudicial enough to warrant reversal").

**D. Enhanced Sentence for Possession of an Unregistered Firearm**

Finally, we address appellant's argument that the sentence of 22 months of incarceration imposed for possession of an unregistered firearm exceeded the statutory maximum in the absence of the government filing enhancement papers prior to trial, pursuant to D.C. Code § 23-111(a). The government agrees that resentencing is appropriate because it did not file the necessary enhancement papers prior to trial. It was error for the court to impose an enhanced penalty when the government failed to comply with D.C. Code § 23-111. *Robinson v. United States*, 756 A.2d 448, 454 (D.C. 2000). Therefore, we remand for resentencing pursuant to D.C. Code § 7-2507.06(a), which limits the sentence of possession of an unregistered firearm to a maximum of one year of incarceration. *Robinson*, 756 A.2d at 454-55.

**III.  Conclusion**

For the reasons stated above, we affirm appellant's convictions. We remand the case, however, for the limited purpose of correcting appellant's sentence, in light of the government's failure to file the enhancement papers, pursuant to D.C. Code § 7-2507.06(a), which provides a maximum one-year incarceration period for

appellant's conviction of possession of an unregistered firearm, D.C. Code § 7-2502.01.

*So ordered.*