*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 23-CM-0627 & 24-CM-0408

DEREK J. MORRIS, APPELLANT

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2020-CMD-000684)

(Hon. Errol R. Arthur, Trial Judge)

(Argued January 7, 2025                    Decided June 26, 2025)

*Thomas G. Burgess* for appellant.

*Amanda Claire Hoover*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney at the time the brief was filed, and *Chrisellen R. Kolb*, *John P. Mannarino*, *Anthony Cocuzza*, and *Mark Levy*, Assistant United States Attorneys, were on the brief, for appellee.

Before BECKWITH, EASTERLY, and MCLEESE, *Associate Judges*.

EASTERLY, *Associate Judge*: We consider in this case the adequacy of the standard jury instruction for the offense of unlawful entry (remaining on *public* premises without authority). D.C. Code § 22-3302(b). Appellant Derek J. Morris

was convicted of one count of this offense after he refused to leave the United States Supreme Court Clerk's Office (Clerk's Office), where he was attempting to file a pro se petition for a writ of certiorari in contravention of the Supreme Court's procedures for in-person filing.  The Superior Court instructed the jury in accordance with the model instruction for this offense, but that model instruction does not clearly set forth what this court has somewhat opaquely referred to as the "additional, specific factor" requirement, which distinguishes this offense from the offense of unlawful entry (remaining on *private* premises without authority).  Pursuant to this "additional, specific factor" requirement, the government must do more than prove that a defendant disregarded an order to leave the property by a person with authority (the requirement if the property were private); the government must also prove the order to leave the property itself was supported by some independent justification.  The upshot of this requirement—which we rename here, more descriptively, the "independent justification" requirement—is that an order to leave public property by a person with authority cannot simply be given on the whim of that individual; the person with authority must be enforcing some established policy, rule, or regulation.

Assuming that the Superior Court's instruction is reviewable for plain error, we agree with Dr. Morris that the failure to instruct the jury about the independent justification requirement constitutes error, and we hold that going forward juries

must be given more specific guidance about this requirement as set forth in the comments to the model instruction. But because Dr. Morris has not carried his burden to establish that this error affected his substantial rights, we affirm.

## I. Facts & Procedural History

### A. Supreme Court Procedures

Pro se litigants, like Dr. Morris, may file documents with the Supreme Court in one of two ways: (1) by mail or (2) by hand delivery. If a litigant chooses the second route, they may not file their documents directly at the Clerk's Office; instead, they are required to hand deliver the documents to the Supreme Court of the United States Police Department (Supreme Court Police) officers staffing the security booth outside of the courthouse to ensure the documents are tested for harmful materials before they are sent to the Clerk's Office. There are signs at the public entrance of the Supreme Court building that instruct: "Any filings will be submitted to the booth at the rear of the building."

Members of the public may enter the Clerk's Office, but only for business purposes, such as asking questions about their case. A sign outside of the Clerk's Office says: "For business purposes only." As one Supreme Court Police officer explained at Dr. Morris's trial, he and his colleagues have authority to remove

people from the building "if they break the law or if [they are] being disruptive to the court and its functions, the decorum of the court is interfered with, . . . things of that nature."

## B. Dr. Morris's Attempts to File a Pro Se Petition for a Writ of Certiorari

Prior to his visit to the Supreme Court on January 14, 2020, Dr. Morris had tried to file a pro se petition for a writ of certiorari at the Supreme Court by mail, but the Clerk's Office had rejected his filing as untimely. Dr. Morris then traveled multiple times from his home in California to the District of Columbia to attempt to file his petition with the Court in person. During these attempts, he was told that he must deliver his filing to the police booth outside of the building, and he did so on at least one occasion. On another occasion, Dr. Morris went to the Clerk's Office to file his petition and refused to leave for several hours, until a Supreme Court Police officer accepted the filing from him and delivered it to the police booth for him. On yet another occasion, an employee in the Clerk's Office took the petition from Dr. Morris and delivered it to the booth on his behalf.

On January 14, 2020, Dr. Morris, having flown once again from California to the District of Columbia, entered the Supreme Court building and went to the Clerk's Office. The facts regarding what happened in the Clerk's Office are largely undisputed. After an employee staffing the front desk, Mr. Bolden, asked Dr. Morris

how he could be of assistance, Dr. Morris informed him, "I'm here to file a petition for a certiorari." Mr. Bolden retrieved Mr. Barnes, the Clerk's Office analyst assigned to Dr. Morris's case and the author of the letters informing Dr. Morris that his petition was untimely. Recognizing Mr. Barnes from his previous attempts to file his petition, Dr. Morris declined to speak with him and asked instead to speak to Scott Harris, the Clerk of the Court. The interaction was unproductive. Mr. Bolden recalled Dr. Morris telling Mr. Barnes in a raised voice, "You're not my attorney, you're not a[n] attorney, don't touch my shit" and "don't touch my F'ing papers," while pointing at him. Dr. Morris recalled saying to Mr. Barnes, "Don't you even open your mouth," and when Mr. Barnes tried to touch his papers, he instructed Mr. Barnes, "Get your hands off my papers." Eventually, Mr. Barnes walked away after explaining that if Dr. Morris did not want to speak with him, he would not be able to help Dr. Morris.

At this point, Mr. Bolden went to get Supreme Court Police officers and brought them back to the Clerk's Office. Dr. Morris told the officers that he wanted them to arrest some of the Clerk's Office employees and that he wanted to file his petition. The officers told Dr. Morris that they would not arrest employees and that he could not file paperwork directly in the Clerk's Office; he had to file the paperwork at the police booth outside. Dr. Morris declined to show the officers his paperwork; instead, Dr. Morris placed his paperwork on the front counter of the

Clerk's Office, saying, "We'll see what happens after." The officers again told Dr. Morris that he would have to file the petition in the police booth outside of the building, which Dr. Morris refused to do. Throughout their interaction, the officers asked Dr. Morris to leave multiple times over the course of about thirty minutes. At some point, the Chief of the Supreme Court Police responded to the Clerk's Office; the Chief ultimately told Dr. Morris that he no longer had any lawful business before the Court and that, if he did not leave, he would be arrested. Dr. Morris then put his hands behind his back and told the officers to arrest him, which they did.

### C. Dr. Morris's Trial

Dr. Morris was tried before a jury on one count of unlawful entry (remaining on public premises without authority). On the evening of the first day of trial, Dr. Morris emailed the court a proposed instruction that included all seven elements set forth in the model instruction for this offense, *see* Criminal Jury Instructions for the District of Columbia No. 5.401(B) (5th ed. 2024),[1] and added an eighth element

---

[1] Before the Superior Court, the parties at various points cited both the 2021 and 2022 releases of the model instruction, which are both identical to the 2024 release (the current version at the time of the writing of this opinion). *Compare* Criminal Jury Instructions for the District of Columbia No. 5.401(B) (5th ed. 2021), *and* Criminal Jury Instructions for the District of Columbia No. 5.401(B) (5th ed. 2022), *with* Criminal Jury Instructions for the District of Columbia No. 5.401(B) (5th ed. 2024). For consistency and simplicity's sake, we cite the 2024 release throughout.

in an attempt to account for the fact that the building in question was open to the public. The proposed instruction read as follows:

> The elements of this offense, each of which the government must prove beyond a reasonable doubt, are that:
>
> (1) [Name of defendant] was present in [a restricted part of] [a dwelling] [a building] [property];
>
> (2) [Name of defendant] was directed to leave the property by [name of complainant];
>
> (3) [Name of complainant] was the lawful occupant or person lawfully in charge of the [dwelling] [building] [property];
>
> (4) At the time [name of defendant] was directed to leave the property, s/he did not have lawful authority to remain there;
>
> (5) S/he knew or should have known that s/he was remaining on the property against the will of [the lawful occupant] [or] [the person lawfully in charge of the premises];
>
> (6) Upon being directed to leave the property, s/he refused to leave; and
>
> (7) The [dwelling] [building] [property] was [public][private];
>
> (8) That the defendant did not have a legal right to remain.

(alterations in original). To support his request for this eight-part instruction, Dr. Morris discussed cases from this court holding that, to be convicted of unlawful entry for remaining on public property, not only must a person be ordered to leave

by a person lawfully in charge, but there must be "some additional specific factor establishing the party's lack of a legal right to remain." *O'Brien v. United States*, 444 A.2d 946, 948 (D.C. 1982). The same evening, the government objected to the addition of an eighth element, arguing that it was duplicative of the fourth element of the proposed and model instructions. *See* Criminal Jury Instructions for the District of Columbia No. 5.401(B) (5th ed. 2024). When the court and the parties discussed the issue the next day, Dr. Morris's counsel informed the court, "actually, I concur with the Government. I think that that element four will suffice." The court then asked if Dr. Morris was withdrawing his request to add an eighth element, and defense counsel responded, "Yes."

At the close of evidence, the trial court gave the jury the model instruction for unlawful entry (remaining on public premises without authority).[2] The parties then delivered their closing arguments.

---

[2] The court identified the "Supreme Court of the United States" as the "building" where Dr. Morris was unlawfully present and "an officer of the Supreme Court . . . Police" as the "person lawfully in charge" of that building. As delivered, the instruction read:

> One, that Dr. Morris was present in [a] restricted part of the Supreme Court of the United States;
>
> two, Dr. Morris was directed to leave the property by an officer of the Supreme Court of the United States Police;

The government went through each of the seven elements of unlawful entry as set forth in the model instruction, discussing the evidence it believed supported each. Of these seven elements, the government highlighted element four—Dr. Morris's lack of lawful authority to remain—predicting this element "is what the Defense is going to harp on." The government argued it had proved this element for two reasons. First, the government reminded the jury that the Clerk's Office and the area around it "was for business purposes only," which included asking questions about one's case but did not include filing a pro se petition, as Dr. Morris knew or should have known, having been to the Supreme Court multiple times and having had Court staff explain the filing procedures to him. Dr. Morris, who told the Supreme Court Police officers that he was at the Clerk's Office to have employees

three . . . an officer of the Supreme Court of the United States Police was a lawful occupant or person lawfully in charge of the property;

four, at the time Dr. Morris was directed to leave the property, he did not have the lawful authority to remain there;

five, Dr. Morris knew or should have known that he was remaining on the property against the will of the lawful occupant or . . . the person lawfully in charge of the premises;

six, upon being directed to leave the property, Dr. Morris refused to leave; and

seven, the Supreme Court of the United States was public property.

arrested and to file his petition, therefore had no legitimate business purpose for being there.  In addition, the government argued that Dr. Morris's "behavior was . . . disruptive," which "alone" provided "a legitimate reason for the officers to eject Dr. Morris from the Supreme Court Clerk's Office."  The government emphasized that Dr. Morris had "essentially" admitted he was "tired of dealing with" Mr. Barnes, that Dr. Morris had been "upset" and "argumentative," and that Dr. Morris had told Mr. Barnes, "You're not my attorney, you're not an attorney, don't touch my shit."

As predicted by the government, defense counsel in his closing told the jury, element "[f]our"—Dr. Morris's lack of lawful authority to remain—"is what I want you to concentrate on."  In the discussion of this element, defense counsel stressed the difference between public and private spaces.  He explained that, whereas the manager at a McDonald's, a private business, could for whatever reason simply tell someone to leave the premises, "[f]or our public institutions, the government has to take one step further," because of the First Amendment rights at stake.  Defense counsel elaborated:

> So, if I come into this building and the marshal over there or the marshal over there says, "Get out," it doesn't work that way.  I[t is] not unlawful entry because the marshal told me to get out.  There has to be more.  There has to be—it just can't be because [the marshal] decides that he wants to kick me out. . . .  This is not McDonald's.  This is not a private building . . . , and so there must be more than [the marshal] just telling me I have to leave.  [The

> marshal] ha[s] to . . . tell me why am I not legally permitted to be here. This is our court system . . . . We want our government to act the way it's supposed to act. [Not to] act on a whim. . . . [S]ome clerk [can]not . . . just say get out. It doesn't work that way. There has to be a little bit more to it.

As for the two independent justifications the government provided for the order to leave—Dr. Morris was not in the Clerk's Office for an authorized business purpose and was being disruptive—defense counsel argued the evidence was in Dr. Morris's favor. Defense counsel asserted that Dr. Morris "went in there with a legitimate purpose to discuss his pleadings, his lawful right," and he was not being disruptive simply by trying to talk to people in a calm, nonviolent manner. Defense counsel then again stressed that "essentially what element four says—you just cannot on a personal whim, chief of police, come in there and say, 'Arrest him.' It doesn't work that way." And defense counsel urged the jury in deliberations to "go through the elements, . . . but when you get to element four," to remember that Dr. Morris was not in McDonald's or some other private space; he was in the United States Supreme Court.

In rebuttal, the government agreed with defense counsel that "this case really boils down to the fourth element" and said that "the Defense's theory of [the] case is that the Chief of Police was called down to the Clerk's Office in the Supreme Court of the United States[ and] acted on a whim by having [D]r. Morris removed

from the building in handcuffs." The government, however, disputed that the Chief of Police had acted without independent justification. The government renewed its argument that Dr. Morris had no legitimate business purpose for being in the Clerk's Office and was instead seeking to violate the Supreme Court's rules by filing a pleading without submitting it to the police booth outside. The government also reiterated that Dr. Morris "caused a disruption" in the Clerk's Office of a "functioning court" and that the Chief of Police was "allowed to eject him at that point."

After deliberating, the jury returned a guilty verdict. Dr. Morris now appeals his conviction.

## II.    Analysis

Before this court, Dr. Morris argues that the Superior Court failed to adequately instruct the jury about the offense of unlawful entry (remaining on public premises without authority), and specifically, that it failed to instruct the jury that he could not be found guilty unless the government proved that the police directive to Dr. Morris to leave had an independent justification. We consider first whether and under what standard we should review this issue. Concluding that it is at best reviewable for plain error, we apply that test and hold that, although the court erred,

Dr. Morris has not met his burden to establish that the error affected his substantial rights.

## A.    Whether and Under What Standard We Should Review the Claimed Error

Although Dr. Morris initially requested a change to the model instruction in an attempt to clarify for the jury that the police's order to leave must have had an independent justification, he eventually withdrew that request. Dr. Morris nonetheless argues that he preserved this issue on appeal because he created a "sufficient record to 'direct the judge's attention to the correct rule of law.'" *Hasty v. United States*, 669 A.2d 127, 134 (D.C. 1995) (quoting *Whitaker v. United States*, 617 A.2d 499, 508 (D.C. 1992)). We acknowledge that our preservation rules are more functional than formalistic: No magic words are required, "so long as the judge is fairly apprised as to the question on which she is being asked to rule." *Medhin v. United States*, 308 A.3d 1242, 1246 (D.C. 2024) (quoting *Tinsley v. United States*, 868 A.2d 867, 883 (D.C. 2005) (Glickman, J., concurring in part and dissenting in part)). But even under this functional standard, Dr. Morris faces some difficulty. Although he unquestionably alerted the Superior Court to this court's caselaw making it clear that an order to leave a public space must have independent justification, he did not explain to the court how the instruction it planned to give to

the jury failed to convey that legal requirement. Indeed, he withdrew his only request to augment the model instruction and affirmatively stated that the fourth element of the model instruction would "suffice" to address his concerns about this point of law. Thus, we cannot say he adequately preserved his claim of instructional error. *See Alleyne v. United States*, 327 A.3d 472, 483 (D.C. 2024) ("To preserve an argument of instructional error for appeal . . . [a] general objection does not suffice;" the objection must "be made with sufficient precision to indicate distinctly the party's thesis." (quoting *Russell v. United States*, 698 A.2d 1007, 1012 (D.C. 1997))); *see also* Super. Ct. Crim. R. 30(d) ("A party who objects to any portion of the [proposed jury] instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection . . . .").

We disagree that *Hasty* compels a different conclusion. In *Hasty*, counsel argued on appeal that the trial court had failed to advise the jury about the "tourist standard" when delivering the instruction for the offense of demonstrating within the U.S. Capitol Building. 669 A.2d at 129. Although we agreed that trial counsel's proposed instruction did not correctly capture the tourist standard, we nonetheless held that the arguments counsel made and the cases he cited adequately called the issue to the court's attention. *Id.* at 134-35. This case is distinguishable from *Hasty* because, as noted, counsel in this case both withdrew his one proposed change to the model instruction and indicated that the model instruction accurately captured the

law.

For this reason, the government argues that we should not review this question at all, invoking the invited error doctrine. This doctrine generally "precludes a party from asserting as error on appeal a course that [they have] induced the trial court to take." *Young v. United States*, 305 A.3d 402, 430 (D.C. 2023) (alteration in original) (quoting *Preacher v. United States*, 934 A.2d 363, 368 (D.C. 2007)); *see also, e.g.*, *id.* at 429 ("However, both [defendants] agreed to this jury instruction at trial, thus inviting the error and waiving any right to raise the claim on appeal."). But even if we agreed that defense counsel induced the trial court to follow the model instruction, we have indicated previously that there are exceptions to the invited error doctrine, and we may still choose to apply plain error review to issues that fall within the doctrine's scope. *See District of Columbia v. Wical Ltd. P'ship*, 630 A.2d 174, 183 (D.C. 1993) (explaining that the invited error doctrine is not "unbending" and that this court is "reluctant" to reverse error that is invited, but "the word 'reluctant' implies that there are extreme situations in which a court will overcome its hesitation; the bar is not absolute"); *see, e.g.*, *White v. United States*, 729 A.2d 330, 333 (D.C. 1999) (declining to deem a challenged ruling invited error, explaining that "[i]n rare cases where a mistaken legal ruling by the trial court is precipitated by an erroneous concession by a party, the party is permitted to have the error corrected on appeal"). Here, we need not decide whether the invited error doctrine

applies because, under the test for plain error, the outcome (affirmance) would be the same. *See, e.g.*, *Chew v. United States*, 314 A.3d 80, 83 (D.C. 2024) (declining to decide whether the defendant's claims were waived and therefore unreviewable or forfeited and therefore subject to plain error review because the claims failed even under plain error review).

## B.     Plain Error Review

To prevail on plain error review, "an appellant must show that (1) there is error[;] (2) such error is plain, meaning clear or obvious, by the time of appellate review; (3) the error affected appellant's substantial rights; and (4) the error seriously affected the fairness, integrity, or public reputation of [the] judicial proceedings." *Thompson v. United States*, 322 A.3d 509, 515 (D.C. 2024) (alterations in original) (quoting *Chew*, 322 A.3d at 83 n.1). Applying this test, we conclude that the Superior Court erred in failing to adequately instruct the jury about the independent justification requirement, but because this error did not affect Dr. Morris's substantial rights, reversal is not warranted. *See, e.g.*, *Keerikkattil v. United States*, 313 A.3d 591, 603-08 (D.C. 2024) (holding under plain error review that the Superior Court erred, and that the error was clear or obvious, but affirming because the error did not affect the defendant's substantial rights).

### 1.    Prong one: error

To determine if the jury was properly instructed on the offense of unlawful entry (remaining on public premises without authority), we first consider what the law requires the government to prove to establish an individual's guilt of this offense.

As this court explained in *O'Brien v. United States*, 444 A.2d 946 (D.C. 1982), the government must prove that the defendant both "refuse[d] to leave on the demand of the person lawfully in charge" and remained on the property "without lawful authority." *Id*. at 948.    But depending on the nature of the property, a legal distinction arises in what must be proved to establish the deprivation of lawful authority to remain.    "As applied to private property," the refusal to leave on demand and the remaining without authority elements "merge." *Id.*    In other words, if a person lawfully in charge of private property tells the defendant to leave, the defendant then lacks lawful authority to remain. *See id.*    But the same is not true when the property in question is public.

An order to leave public property by a person lawfully in charge of that property cannot alone establish a lack of lawful authority to remain. *Id.*    People generally have a right to be in public spaces, and they may use those spaces to exercise their rights to free speech, to assembly, and to petition the government,

subject to pre-established, reasonable restrictions. *See* U.S. Const. amend. I; *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939) ("Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens."); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983); *see also Wheelock v. United States*, 552 A.2d 503, 506 (D.C. 1988) ("It bears repeating that '[t]he general concepts of First Amendment freedom are given added impetus as to speech and peaceful demonstration in Washington, D.C., by the clause of the Constitution which assures citizens their right to assemble peaceably at the seat of government and present grievances.'" (alteration in original) (quoting *A Quaker Action Grp. v. Morton*, 516 F.2d 717, 724 (D.C. Cir. 1975))). Thus, ejecting a person from public property can have both Due Process and First Amendment implications. *See Carson v. United States*, 419 A.2d 996, 998 (D.C. 1980) (discussing void for vagueness and First Amendment concerns); *Shiel v. United States*, 515 A.2d 405, 407-08 (D.C. 1986) (First Amendment); *United States v. Powell*, 563 A.2d 1086, 1089-90 (D.C. 1989) (notice and First Amendment); *Simon v. United States*, 570 A.2d 305, 306 (D.C. 1990) (same). An order to leave public property must therefore be supported by a

pre-established rule that survives First Amendment scrutiny[3] to ensure that "an individual's otherwise lawful presence [on public property] is not conditioned upon the mere whim of a public official." *Carson*, 419 A.2d at 998 (quoting *Leiss v. United States*, 364 A.2d 803, 806 (D.C. 1976)[4]); *accord Wheelock*, 552 A.2d at 505.

Against this backdrop, our court has held in the specific context of the offense of unlawful entry (remaining on public premises without authority) that "individual citizens may not be ejected from public property on the order of the person lawfully in charge absent some additional, specific factor" i.e., some independent justification, "establishing their lack of a legal right to be there." *Carson*, 419 A.2d at 998. Possible independent justifications include "posted regulations, signs or

---

[3] The level of scrutiny required may depend on the type of forum at issue. *See Wheelock*, 552 A.2d at 506 n.2.

[4] In *Leiss*, this court rejected due process and First Amendment challenges to the statute prohibiting unlawful entry (remaining on public premises without authority). 364 A.2d at 805-06. We declared, without analysis of the specific text, that the plain language of the statute "prohibits the act of entering or remaining upon any property when such conduct is both without legal authority and against the expressed will of the person lawfully in charge of the premises." Thus this court determined that the statute did not condition "an individual's otherwise lawful presence . . . upon the mere whim of a public official to whom the statutory language lends no guidance." *Id.* at 806. As *Carson* effectively determined, *Leiss* narrowly construed the statute to protect it from vagueness and First Amendment challenge. *See Carson*, 419 A.2d at 998 (explaining that the statute is "saved" because, "under the statute as construed in *Leiss*, individual citizens may not be ejected from public property on the order of the person lawfully in charge absent some additional, specific factor establishing their lack of a legal right to be there").

fences and barricades regulating the public's use of government property, or other reasonable restrictions." *Id.* For example, we have held that a WMATA regulation prohibiting people from leafletting within fifteen feet of Metro escalators and the presence of chains separating the White House lawn from the designated tourist area each constituted an independent justification supporting an order to leave public property and provided a foundation for a conviction for unlawful entry (remaining on public premises without authority). *See O'Brien*, 444 A.2d at 948-49; *Carson*, 419 A.2d at 998.

The parties rightly agree that the independent justification requirement must be reflected in the instruction given to the jury regarding the offense of unlawful entry (remaining on public premises without authority). "[W]here, as here, provisions of the statute would be unconstitutional absent such an interpretation, the court must assure that a defendant's conviction is based upon the statute as construed." *Hasty*, 669 A.2d at 129; *see also Osborne v. Ohio*, 495 U.S. 103, 118 (1990) ("[W]here a State Supreme Court narrows an unconstitutionally overbroad statute, the State must ensure that defendants are convicted under the statute as it is subsequently construed and not as it was originally written."); *cf. Keerikkattil*, 313 A.3d at 603 (holding that it was error for the Superior Court to fail to instruct the jury on the narrowing construction our court imposed on the District's criminal stalking statute in *Mashaud v. Boone*, 295 A.3d 1139 (D.C. 2023) (en banc)).

The question, therefore, is whether the model instruction the court delivered adequately informed the jury about the independent justification requirement. We conclude it did not. The instruction failed to convey that an order to leave, standing alone, does not deprive a person of lawful authority to remain on public premises, and there must be something above and beyond that order—an established policy, rule, or regulation—to justify that order.[5]

The government nevertheless argues that the second and fourth elements of the model instruction together suffice to convey the independent justification requirement. Although these two elements are the legal hook of the independent justification requirement, *see supra*, neither explicitly explains that requirement. Element two states that the defendant must have been "directed to leave the property," and element four states that "[a]t the time [the defendant] was directed to leave the property, s/he did not have lawful authority to remain there." Criminal Jury Instructions for the District of Columbia No. 5.401(B) (5th ed. 2024). The

---

[5] We acknowledge that, in *Leiss*, we stated that "[t]he type of conduct subject to [the unlawful entry statute's] sanctions is clearly identified in words of common understanding, with little room for misinterpretation or conjecture." *Leiss*, 364 A.2d at 806. But as we explained above, *see supra* note 4, *Leiss* did not actually examine the text of the statute; instead, it narrowly construed the statute to save it from unconstitutionality and thus cannot support the proposition that an instruction that tracks the statute is sufficiently clear to instruct a jury on that narrowing interpretation.

government suggests that there would be no reason to have two separate elements for the order to leave and lawful authority to remain unless they meant different things—and that a jury of laypeople would understand that the individual who gave an order to leave must have had an independent justification for that order. We cannot agree.

We generally do not expect, and certainly do not rely upon, jurors to act like courts, drawing inferences from the structure of jury instructions, and applying the canon against superfluity to interpret the instructions they have been given.[6] To the contrary, precisely because we accept that juries are generally composed of laypeople not expert in the law, we demand that jury instructions provide jurors with clear guidance as to the legal principles they are required to apply. *See Buskey v. United States*, 148 A.3d 1193, 1208 (D.C. 2016) (explaining that a "jury instruction as a whole should provide the jury with a clear path to understanding the substantive law"); 9C Wright & Miller's Federal Practice & Procedure § 2556 (3d ed. 2025) ("It is axiomatic that the trial court should charge the jury in plain language."); *see, e.g., (Lester) Williams v. United States*, 314 A.3d 1158, 1180 (D.C. 2024) (focusing on

---

[6] The unreasonableness of expecting the jury to draw implications from the structure of the model instruction is enhanced where that instruction contains seven elements, and the two elements the government suggests adequately conveyed the independent justification requirement are not even side-by-side. Criminal Jury Instructions for the District of Columbia No. 5.401(B) (5th ed. 2024).

the "plain language" of the jury instruction to determine what the jury would have read the instruction to mean); *Townsend v. Donaldson*, 933 A.2d 282, 289 (D.C. 2007) (same); *cf. Hasty*, 669 A.2d at 133 (rejecting as "not persuasive" the government's argument that the court's instruction adequately conveyed the law to the jury where the government itself turned to the dictionary to define a term in the instructions that was undefined).[7]

The clarity that is missing from the model instruction comes into relief when we look to the comment to the instruction, which the jury did not hear. The comment states: "Where a public or semi-public building is entered, the statute requires that, in addition to and independent of an express order to leave the premises, there exists some additional specific factor establishing the lack of a legal right to remain, such as posted regulations, signs, fences, or barricades." Criminal Jury Instructions for the District of Columbia No. 5.401(B) (5th ed. 2024) cmt. This explanation does

---

[7] As noted above, the model unlawful entry instruction is currently the same for public and private premises, but we expect jurors to "merge" elements two and four when the property in question is private. *O'Brien*, 444 A.2d at 948; Criminal Jury Instructions for the District of Columbia No. 5.401(B) (5th ed. 2024). The government's argument implies that juries in cases involving private property would interpret this instruction (incorrectly) to require an independent justification for the order to leave, because there would be no reason to have two elements that meant the same thing. These observations might justify revision of the model instruction for unlawful entry (remaining on private premises without authority), but such revision is beyond the scope of this opinion.

what the model instruction does not: It describes the relationship between the order to leave and the authority to remain and explains what could constitute an additional, specific factor.

Because the model instruction given to the jury did not explain clearly what is proscribed by the law and what is not, giving that instruction was error. Going forward, any instruction on unlawful entry (remaining on public premises without authority) should contain the language that appears in the comment to the model instruction, altered to include our new "independent justification" terminology. That instruction should read: In addition to an express order to leave the premises, there must exist some independent justification establishing the lack of a legal right to remain, such as posted regulations, signs, fences, barricades, or some other pre-established policy, rule, or regulation.[8]

## 2.      Prong three: substantial rights

Having concluded that the Superior Court committed error, we proceed directly to prong three of the test for plain error: whether this error affected Dr. Morris's substantial rights. We conclude Dr. Morris has not carried his burden

---

[8] For guidance on where this language should appear within the broader instruction for unlawful entry (remaining on public premises without authority), see Appendix A.

to make such a showing. *Perez v. United States*, 968 A.2d 39, 93 (D.C. 2009) (explaining that the burden under prong three of the test for plain error falls on the defendant/appellant).

For an error to affect substantial rights, it must have had "a prejudicial effect on the outcome of [the] judicial proceeding." *Id.* (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 81 (2004)). In other words, the defendant must show a "reasonable probability that but for the error the factfinder would have had a reasonable doubt respecting guilt." *Muir v. District of Columbia*, 129 A.3d 265, 275 (D.C. 2016) (quoting *Portillo v. United States*, 62 A.3d 1243, 1259 (D.C. 2013)). In assessing whether the defendant has carried this burden, we look to the entire "context of the trial," *id.* (quoting *Portillo*, 62 A.3d at 1259), including "the evidence introduced, the arguments of counsel, the instructions provided, and the actions of the jury," *Hagood v. United States*, 93 A.3d 210, 222 (D.C. 2014). "In the jury instruction context, substantial rights may be affected, for instance, where the evidence or verdict indicates that the jury was misled or confused." *(Erick) Williams v. United States*, 858 A.2d 984, 1000 (D.C. 2004).

Here, there is no evidence that the jury was misled or confused. Quite to the contrary, the jury was specifically alerted by the parties' closing arguments to the need to find that the police directive to Dr. Morris was supported by an independent

justification. Indeed, as detailed above, *see supra* Part I.C., whether this requirement had been met became the exclusive focus of the parties' arguments. Anticipating that the defense would argue under element four of the model instruction that Dr. Morris had lawful authority to refuse to leave the Clerk's Office, the government argued why that was not the case: (1) the Clerk's Office was open only "for business purposes," which did not include accepting filings from pro se litigants, and (2) the Supreme Court Police officers were authorized to remove individuals who were disrupting the court and its functions. Defense counsel then discussed the rationale for the independent justification requirement at length and argued that Dr. Morris had been in the Clerk's Office for the lawful purpose of discussing his pleadings and had been trying to speak with people calmly and nonviolently. Lastly, on rebuttal, the government argued that the case "boil[ed] down to" whether the "the Chief of Police . . . acted on a whim by having [D]r. Morris removed from the building in handcuffs" and again argued that the Chief had multiple independent justifications for taking this action. In short, counsels' arguments both clearly defined the independent justification requirement and established that this was the question on which the case turned.

Moreover, we can say with confidence that the jury convicted Dr. Morris, not because it lacked understanding of the independent justification requirement, but because defense counsel's argument that the government had failed to carry its

burden of proof with respect to this requirement disregarded the evidence. The government presented undisputed testimony that pleadings could not be filed directly in the Clerk's Office and that Dr. Morris was not asking questions about his case. Dr. Morris therefore had no lawful business purpose to be in the Clerk's Office. Defense counsel argued in closing that Dr. Morris was in the Clerk's Office to ask questions in addition to filing his pleadings, but Dr. Morris never so testified, and there was no evidence to support this argument. Likewise, the government proved that Dr. Morris was disrupting court business when it presented uncontroverted evidence that submitting filings directly in the Clerk's Office was prohibited for safety and security reasons; Dr. Morris was told he could not file his petition in the Clerk's Office; he nevertheless insisted on attempting to do so; he remained in the Clerk's Office for over thirty minutes, during which he used a raised voice, was argumentative with court staff, and told them, "Don't you even open your mouth" and, "Don't touch my shit"; and he asked the police who responded to arrest Clerk's Office staff. Defense counsel had no response to the government's arguments other than to argue that Dr. Morris was "actually pretty calm" and was

"never violent" in the Clerk's Office.[9]

Because Dr. Morris has not established that the instructional error affected his substantial rights, we conclude that he is not entitled to reversal of his conviction on plain error review.

### III.   Conclusion

For the foregoing reasons, we affirm Dr. Morris's conviction.

*So ordered.*

---

[9] Although Dr. Morris now suggests otherwise, defense counsel did not challenge before the jury the existence or validity of the government's proposed independent justifications—namely, that the business purposes for which the Clerk's Office was open to the public did not include filing pro se petitions and that disruptive behavior was prohibited in the Clerk's Office.

## Appendix A

The elements of this offense, each of which the government must prove beyond a reasonable doubt, are that:

1. [Name of defendant] was present in [a restricted part of] [a dwelling] [a building] [property];

2. [Name of defendant] was directed to leave the property by [name of complainant];

3. [Name of complainant] was the lawful occupant or person lawfully in charge of the [dwelling] [building] [property];

4. At the time [name of defendant] was directed to leave the property, s/he did not have lawful authority to remain there;

5. S/he knew or should have known that s/he was remaining on the property against the will of [the lawful occupant] [or] [the person lawfully in charge of the premises];

6. Upon being directed to leave the property, s/he refused to leave; and

7. The [dwelling] [building] [property] was [public] [private].

A person may be [the lawful occupant] [lawfully in charge] of the property even though there are other persons who could, if they chose to do so, cancel or override his/her authority. There may be more than one person who has the authority to order a person to leave the property.

[*Give for public property*] [**In addition to an express order to leave the premises, there must exist some independent justification establishing the lack of a legal right to remain, such as posted regulations,**

**signs, fences, barricades, or some other pre-established policy, rule, or regulation.]**

[You have heard evidence that [name of defendant] believed that s/he had a right to remain in the area in question. One who remains in a restricted area with a good faith belief of his/her legal authority to remain there is not guilty of unlawful entry. Thus, you cannot find [name of defendant] guilty of unlawful entry unless you are convinced beyond a reasonable doubt that s/he did not have a good faith belief in his legal authority to remain in the area after being directed to leave.]

[A building or property is "public" when it is owned by the District of Columbia or the United States. A building or property is "private" when it is not owned by the government, even if the public is generally allowed to enter the building or property. [Housing that is owned, operated, or financially assisted by the District of Columbia Housing Authority is "private."]]